Whitaker, Judge,
delivered the opinion of the court:
Plaintiff, the assignee of the Norris patent, 1,726,500, sues to recover damages for its alleged infringement. The defendant defends upon the ground, among others, that the alleged invention was anticipated by prior art and knowledge,, and, therefore, was lacking in patentable novelty. ,
The patent is on sound-deadening construction. It consists, briefly, of a sound-absorbing backing, such as felt or wool, covered and held in place by a thin membrane of sheet steel, tin, veneered wood, or similar sound-reflecting material, punctured at intervals to permit the passage of the sound waves through the membrane into the sound-absorbing backing.
Most of the claims in suit are indefinite as to the size and spacing of the holes in the membrane. For instance, claim 1 says that “the ratio of the unperforated area of said sheet to the openings therein being such as to expose an apparently substantially continuous surface to the sound waves.” Claims 5 and 23 are substantially to the same effect. Claim 2 says only that the dimensions of the holes should be less than the distance between the edges thereof. Claim 3 says the holes should be small enough to conceal the sound-absorbing material. Claim 6 says the size of the holes should be greater than the thickness of the membrane. Claim 7 is a combination of claims 6 and 2. Claim 9 is also a combination of claims 6 and 2, but adds the statement that the membrane is supported at its margins. Claim 12 specifies the size of the holes at from 0.004 square inch to 0.0123 *700 square inch. Claim 13 says the holes should have a minimum dimension less than 0.125 inch and should be at least 0.177 inch apart.
Claim 11 says that the total area of the holes should be less than the unperforated part of the membrane. Claim 14 says the holes should coyer from 0.4 percent to 35 percent of the area of the membrane. Claim 4 says the holes should cover not more than 16 percent of the area. Claim 8 says the spacing of the holes should bear “such relation to the length of the sound waves passing therethrough as to provide a combined sound-absorbing efficiency as great as that of said high capacity sound-absorbing material.”
It will be noted that the size of the holes and the spacing between them varies greatly, the total area to be perforated varying from 0.4 of 1 percent to 49 percent. The only guide found in the claims to determine the size and number of the holes is that they should be of a size greater than the thickness of the membrane, that the space between them should be greater than their size and that the number of them should bear that relation to the sound waves passing through them which gives as great an efficiency to the backing when covered by the perforated membrane as it had without it. The size of the holes and the space between them that would give equal efficiency is not stated in the claims; but in the specifications it was said “that the spacing of the holes should be determined by the pitch of the sound which is absorbed. The lower the pitch of the sound, that is, the smaller the number of double vibrations per second and the longer the wave length, the greater may be the distance between the holes to secure the same absorption.”
We have, then, a patent consisting of a sound-absorbing backing covered with a thin sound-reflecting material of wood or metal to conceal the backing and to hold it in place, with holes in it of a size and spaced apart at a distance dependent on the pitch of the sound to be absorbed. The graph in the specifications shows that maximum absorption of sound waves of 512 double vibrations per second is obtained with holes every square inch. When the pitch of the sound is doubled there may be two holes per square inch, and when doubled again, four holes per square inch, etc.
*717 Contract Documents or that any record or ruling of the Contracting Officer is unfair, shall be considered or entertained unless a protest is submitted in writing to the Contracting Officer within ten days after receipt of demands for such work or of such record or ruling stating clearly the basis of the Contractor’s objections. Unless the Contractor files such protest as above provided, he will be deemed to have accepted, and shall be conclusively bound by, such demand, record, or ruling.
The specifications further provided how samples should be submitted and stated that—
Approval of any sample shall be only for characteristics and for the use named in such approval and for no other use. Approval of sample shall not be taken, in itself, to change or modify any of the Contract requirements.
All samples were to be submitted through the Project Manager.
4. Under the specifications plaintiff was required to furnish and install metal casement windows. One provision in the specifications in regard to this item read as follows:
Windows, metal window trim, and screen frames, before leaving the factory, shall be given one heavy prime coat of paint. Paint shall be guaranteed by the window manufacturer to provide a satisfactory base for subsequent coats of paint specified.
The specification with respect to the finish coat of paint which was to be applied on the shop coat read as follows:
Formula No. 6, Quick-Drying Synthetic Interior Metal Enamel: This enamel shall conform to all the requirements of Federal Specification No. TT-E-560, Type “A.”
Specification TT-E-506 referred to white and light tint gloss enamels, and one requirement with respect thereto was that their wet hiding power should be determined by the brush-out method on an impervious black and white checkerboard surface. Further requirements in the specifications included the following:

Painting:

*****
*718 Finish, coat or coats of paint shall be the exact shade, or shades and textures, as approved from the samples submitted.
The finished work shall be free from runs and sags, defective brushing, and clogging of lines or angles.
Shop coats provided by others shall be in good condition and the surfaces well covered. Where required or necessary, bare or abraded spots shall be touched up by the Contractor, using the same materials as used in the shop coat, or other material if approved by the Contracting Officer.

Touching Up:

At the completion of all other work specified all painted work shall be touched up and restored where damaged or defaced and the entire work left free from blemishes.
# Jj: & *

Samples of Finishes:

After colors have been approved the Contractor shall submit finis,h samples of exterior and interior painted wood and metal work for the approval of the Contracting Officer. These samples shall be submitted on metal and wood 6 by 12 inches in size, all submissions to be in accordance with requirements of that portion of this Specification under heading of Samples.
5. The work was carried out under the supervision of an agency of the Federal Public Housing Authority which consisted of three divisions: the accounting division, housing division, and inspection division. The housing division acted as owners. This division was represented on the job by the Project Manager whose duties were described in a bulletin furnished plaintiff by the Director of Housing as follows:
The contractor should contact the Director of Plousing, or the Project Manager as his representative, _ on all matters connected with the preparation and issuance of plans and specifications; taking bids; awarding contracts; interpreting plans and specifications (except that the ordinary application of plans and specifications in the field is the duty of the Inspection Division); approval of samples (materials and colors); approval of subcontractors (with certain exceptions noted herein); subcontract documents; issuance of Proceed Orders, Stop Orders, Change Orders; approval of shop drawings; and on such other matters *719 arising during the progress, of the work as may be handled directly by the Housing Division.
The inspection division was represented by a Project Engineer and the duties of that division were described in the same bulletin as follows:
The Inspection Division will act as the Contracting Officer’s representative on all matters connected with the inspection of materials and workmanship; coordination and progress of the work; compliance with the plans and specifications and enforcement of contract provisions; certification of payments; and such other matters as may be delegated to the Inspection Division.
The contract provided that the work should be completed within 345 days from the date of receipt by the plaintiff of notice to proceed. Plaintiff received such notice December 7, 1936'. The contracting officer granted various extensions in contract time aggregating 99 days, thereby fixing February 24,1938, as the final completion date. Plaintiff completed the project February 22, 1938.
6. Among the items of work required was the furnishing and installing of metal casement windows. This work, including the application of a shop coat of paint to the windows before delivery to the project, was subcontracted by plaintiff to the Truscon Steel Company, hereinafter sometimes referred to as “Truscon.” The painting of these windows after their installation and other painting on the job was subcontracted by plaintiff to Hansen Brothers, hereinafter sometimes referred to as “Plansen.”
7. February 3, 1937, plaintiff submitted a sample metal casement window and screen through Truscon to the Project Manager. February 8, 1937, the Project Manager advised plaintiff with respect thereto as follows:
The sample of steel window submitted by the Truscon Steel Company, of Youngstown, Ohio, for use in the construction of superstructures of Logan Fontenelle Homes Project, which shows the construction of sash, frame and screen as regards the side and top jamb, transom bar and sill, does not show Section E, shown on the Architectural drawings.
Would it be possible for the Truscon Steel Company to submit a sample of a section taken from the center mullion of a twin window %
*720 This window has been approved subject to contract requirements, with the above exception, and with the notation that the transom bar drip should be so constructed that it will fit tightly to the side jambs or be welded together.
February 20, 1937, plaintiff submitted the additional part of the window requested and March 4, 1937, the Project Manager advised plaintiff further in part as follows:
This sample is tentatively approved, subject to the contract requirements and pending submission of complete metal casement window and screen of a size required for the Logan Fontenelle Homes Project, which may be used in the work.
8. The sample window referred to in the preceding finding had thereon a single shop coat of paint but it was not submitted as a sample paint job. Prior to the submission of this sample window, namely, January 21,1937, plaintiff submitted to the Project Manager a sample of paint for the shop coat on steel sash and was advised verbally by him that the paint might be manufacturer’s standard shop paint and need not be tested. A sample of a section of a finished painted window 6 by 12 inches as required by the last specification set out in finding 4 was never submitted by plaintiff. While requests were made by the Project Engineer for the submission of such a sample, the record does not show whether the requests were made prior to the beginning of the controversy referred to in the succeeding findings.
9. Truscon delivered the windows during the period April to June 1937, and thereafter proceeded with their installation. In preparing the windows Truscon applied two coats of paint with a spray gun in lieu of “one heavy prime coat” as called for by the specifications. Prior to this time Truscon had had difficulty with rust and corrosion on material furnished with a shop coat of paint of one application and it applied the two coats in this instance in order to overcome that difficulty. As heretofore shown, the sample window referred to in finding 7 had only one application of paint.
The shop coat obtained by the two applications gave good coverage, was durable, and prevented rust and corrosion. However, it had an appearance which is characterized as *721 “orange peel.” Its resemblance to an orange peel design results from the explosion of minute globules of paint which form as the paint emanates from the spray gun. The surface in this instance was generally smooth to the touch. The shop coats on the windows delivered contained the ordinary amount of runs and sags which were prohibited by the specifications in the finish coat but which are usually found in painting of this character. The sags and runs are customarily removed at the time of the application of the finish coat. In the controversy which ensued over the orange peel appearance, plaintiff offered no objections to having the sags and runs removed without additional cost to defendant.
10. When Hansen began applying the finish coats of paint their foreman called the Project Engineer’s attention to the “orange peel” or “stippled” effect in the shop coat which was magnified when the finish coat of enamel called for by the specifications was applied to it. On examination of the windows on August 13,1937, which was the first time he had seen the type of finished window proposed to be furnished by plaintiff, the Project Engineer advised Hansen’s painting foreman that the shop coat was unsatisfactory and the painting foreman agreed with that conclusion. August 16, 1937, the Project Engineer sent the following communication to plaintiff:
On Friday, August 13,1937, inspected a sample metal window painted by your painting subcontractor.
The finish of this window is not acceptable in that it gives the appearance of an orange peel finish.
It is quite evident the shop coat is not in condition to receive finish enamel and no doubt it will be necessary for you to remove shop coat and any rust on material and refinish the frames in accordance with contract requirements.
11. Upon receipt of the letter referred to in the preceding finding and on the basis of oral discussions of its representatives with the. Project Engineer, Truscon interpreted the Project Engineer’s objections to mean that the shop coat would have to be removed in order to make the windows acceptable upon the application of the finish coat. However, the Project Engineer did not at any time specifically order the removal of the shop coat but did insist that a paint job *722 be given which in his opinion complied with the specifications. Truscon maintained that the specifications did not prohibit the orange peel appearance on the windows.
August 27,1937, the Project Engineer asked the inspection division at Washington, D. C., to send a representative to inspect the windows in controversy. As a result an inspector (a Mr. Knudsen) came to the job and made his examination August 29 and 30,1937. Knudsen advised plaintiff’s representatives that approximately 50 or 60 percent of the windows were satisfactory but that additional work would be required on the other windows to make them acceptable. While there, Knudsen examined two windows on which corrective work had been done by Hansen’s foreman and approved one of them as a sample. On one of these windows, that in an apartment on the ground floor of the fifth apartment from the east end in building 29-C, the greater part of the shop coat was removed by sanding and using lacquer thinner and glycerine, the time required for such work by Hansen’s foreman being more than an hour. Two coats of enamel were then applied for Knudsen’s inspection. On the other window, that on the ground floor in the fourth apartment from the east end in building 29-C, the same corrective method was followed but to a much less degree, only 15 or 20 minutes being consumed in the operation. The orange peel effect was much more apparent in the latter than in the former, but oven in the former its effect could be seen on close examination. The purpose of having this work done on these two windows was to provide an approved sample which could be followed in the acceptance of the other windows.
12. After he left the job on August 30,1937, a controversy developed as to whether Knudsen had approved the window in the fourth or the fifth apartment, plaintiff insisting on the former and the Project Engineer on the latter. Plaintiff was willing to proceed on the basis of. the window in the fourth apartment but the Project Engineer declined to accept windows which conformed to that sample. At the time of Knudson’s inspection, plaintiff or Truscon made some arrangement with Hansen to put the windows in satisfactory condition for the application of the finish coat *723 for 15 cents per window but later, when their foreman found how much time was required to make them acceptable to the Project Engineer, Hansen declined to carry out the arrangement. Hansen also declined to go. forward with the application of the finish coat where the orange peel effect showed in the shop coat which was true of all windows on the project as originally delivered. Hansen did only a slight amount of painting on the casement windows during the period August 16 to October 30, 1937. Some friction existed between Hansen and Truscon, each blaming the other for the situation which had developed.
13. Truscon and plaintiff protested the ruling of the Project Engineer and insisted that the window which Knudsen had approved had some orange peel appearance, that it was the window in the fourth apartment, and that they were willing to do the necessary work to make the windows conform to that approved window. Insofar as appears from the record, no written protest was filed against the Project Engineer’s ruling of August 16,1937, until September 8,1937, the protests being of an oral nature. On the latter date plaintiff filed a written appeal to the Director of Housing from the Project Engineer’s ruling of August 16, 1937. On September 17,1937, the Project Engineer advised plaintiff in writing that “windows were not acceptable when finished that gave the appearance of orange peel and that if necessary, shop coat should be removed and frames refinished in accordance with contract requirements,” that the sample window approved by Knudsen was in the fifth apartment, and that “windows showing an orange peel finish will not be acceptable.”
September 21, 1937, plaintiff’s representatives took two windows from the project to Washington which they considered representative of the type of work they were willing to do. These windows were selected without the assistance of the Project Engineer in determining whether they were representative of the kind of work which he was requiring to be corrected. At the time of their visit to Washington, the Project Engineer advised the inspection division that these windows were not representative, that one of them had the best shop coat on the job, and that the other was in an *724 above average condition. At the time of this visit to Washington, plaintiff’s representatives were advised verbally by the representatives of the Director of Housing that the window in the fourth apartment was the one which had been approved and that they would be furnished with a copy of a letter which would be written to that effect. A copy of such a letter was never furnished.
September 27, 1937, the Project Engineer confirmed in writing his statement of September 17, 1937, that the approved sample window was in the fifth apartment. October 1, 1937, plaintiff replied to that letter urging that it was the window in the fourth apartment which was approved by Knudsen. On October 5, 1937, the Project Engineer again confirmed his ruling of September 17,1937.
14. During the latter part of September 1937 a special representative of Truscon (a Mr. Fitzpatrick) was sent to the job in an effort to make the windows satisfactory to the Project Engineer. He found that the orange peel effect could be removed by sanding the windows but that this was a very costly process and that a cheaper way to take care of the situation was to remove the entire shop coat from them and apply a new shop coat. He thereupon proceeded in that manner, and by October 30, 1937, had completed approximately 1,300 windows.
15. In the meantime plaintiff and Truscon were continuing their protests against the ruling of the Project Engineer, and insisting that the window which had been approved by Knudsen as a sample was in the fourth apartment. In a protest filed October 16, 1937, plaintiff advised the Director of Housing that it intended to comply with the requirements of the Project Engineer for the removal or treatment of the shop coat of paint on the windows, but that in the event it was ultimately determined that what he required was not proper it would make claim at the completion of the job for additional compensation for any damages sustained. Finally, on October 30, 1937, the Director of Housing ruled that the sample which had been approved was the window-in the fourth apartment, his letter to plaintiff’s counsel reading as follows:
*725 I have received your letter of October 27, pertaining to the above subject in connection with the superstructures of the Logan Fontenelle Homes Project, Omaha, Nebraska.
The Contractor has been informed that the approved sample window is the one located in the living room of the fourth apartment from the east end of Building 29-C.
In reply plaintiff on November 4,1937, wrote the Director of Housing as follow's:
We are assuming, in view of the instructions received from the Project Manager and your letter of October 30, 1937, to our attorneys, that the controversy between the Truscon Steel Company and the Project Engineer as regards the prime coat of paint on the steel windows, has been settled and determined, and that there will be no further delay to the construction of the Project as a whole because of such controversy. We are pleased that the question has been finally settled.
For the reasons evident in the history of this matter and which are all before you, we now request your approval and allowance of an extension of a minimum of thirty days from the present completion date for the completion of this contract, and a waiver of the penalty provision of the contract for that exended period.
November 16,1937, the contracting officer advised plaintiff that its “claim for an extension of time for a minimum period of 30 days is noted and it will be given consideration at the time the other claims that you have filed are reviewed.” The “other claims” referred to requests for extensions of time for completion of the contract.
16. As shown in finding 14, during the controversy over whether Knudsen had approved the window in the fourth or the fifth apartment, Truscon had the shop coat removed on some 1,300 windows and a new shop coat applied thereto. Truscon had this work performed by a subcontractor at a cost to Truscon of $1,879.34 which included the amount paid its subcontractor plus traveling expenses and plus Truscon’s overhead expense allocated to this work. The total cost was reasonable for the services performed. Truscon made claim against plaintiff for the payment of that'amount. Reasonable overhead and profit to plaintiff on account of this item was $394.66.
*726 17. During the period of the controversy little painting work was done on the windows by Hansen and this in turn delayed other work which had to follow the painting. However, entirely apart from this controversy, various matters contributed to the delay in the completion of the contract, some of which arose prior thereto. For example, on July 15, 1937, Hansen complained to plaintiff that their painting work was being delayed through no fault of their own and that they would require an extension of ninety days for their portion of the work. Friction existed among the subcontractors and from time to time subcontractors were complaining to plaintiff that the work was being delayed by other subcontractors. September 13, 1937, plaintiff advised the Project Engineer that all of its exterior doors had been cut too short and that unless it was permitted to do corrective work thereon which would make them acceptable it would require at least four months to get new doors, which would make a substantial delay in the ultimate completion of the project. The Project Engineer advised plaintiff that its request for acceptance of such doors with repair work done thereon was rejected and that the doors must be replaced with doors which would meet contract requirements.
Other instances, either on the part of the plaintiff or its subcontractors, arose from time to time which were not connected with the paint controversy over the windows and which tended to delay the ultimate completion of the contract.
18. August 23,1938, plaintiff filed a claim with the United States Housing Authority on behalf of Truscon for work and labor performed and material furnished pursuant to an alleged “unjustified interpretation of the specifications in connection with the painting of steel windows.” At or about the same time, plaintiff made a claim on a similar ground on behalf of Hansen, and also a claim on its own behalf on the ground that such an interpretation delayed the “final completion of the contract a minimum of thirty days” and thereby increased its cost. At the same time, plaintiff executed the voucher for final settlement but excepted therefrom the claims involved in this proceeding.
19. What action, if any, the United States Housing Authority took on the claims does not appear in the record. *727 However, on July 14, 1939, the Comptroller General denied the claims on the ground that the Project Engineer “acted within the scope of his authority in making the decisions in question.” On a review of that decision the Comptroller General affirmed his previous action. In taking the latter action the Comptroller General made the following statements :
* * * Numerous extensions in contract time aggregating 99 calendar days, were authorized and granted under change orders Nos. Í6, 28, 44, 46, and 49, thus increasing the period established for complete performance under the said contract to 444 days. The evidence of record indicates that notification to proceed was received by you under date of December 7, 1936, thereby fixing February 24, 1938, as the final completion date thereunder. It has been administratively reported that the project was completed and accepted under date of February 22, 1938, and that maintenance thereof was assumed by the Government as of that date. Full and complete payment of the contract price, as modified by the various change orders, has been made to you except, of course, for certain minor deductions made pursuant to the terms thereof.
What modifications were made in the contract by the change orders or the basis of the change orders is not shown by the record. Likewise what delay, if any, in the ultimate completion of the contract may be attributed to the controversy over painting the windows is not satisfactorily shown by the record.
The court decided that the plaintiff was not entitled to recover.
Whaley, Chief Justice,, delivered the opinion of the court:
This case involves the interpretation of the specifications of a contract. The main facts in the case are' not in dispute.
It appears that the plaintiff had a contract with the Government for the construction of the superstructure for a housing project in Omaha, Nebraska. The contract and specifications required the plaintiff to furnish and install metal casement windows. The specifications in regard to these windows provided:
*728 Windows, metal window trim, and screen frames, before leaving the factory, shall be given one heavy prime coat of paint. Paint shall be guaranteed by the window manufacturer to provide a satisfactory base for subsequent coats of paint specified. .[Italics ours.]
A quick-drying synthetic interior metal enamel was specified as a subsequent coat for the interior of the windows. This paint had a tendency to magnify any defects in the shop coat of paint.
Plaintiff subcontracted for the metal casement windows and also for the shop coat painting. The finish painting was also subcontracted by plaintiff.
Instead of plaintiff’s subcontractor applying one heavy prime coat of paint, as specified by the contract, he applied two coats with a spray gun. This method formed a good coverage but left an “orange peel” appearance. This “orange peel” appearance was caused by the explosion of minute globules of paint which formed as the paint emanated from the spray gun. When the finish coat of paint was applied over these two coats of paint, it magnified the “orange peel” appearance.
The plaintiff did not furnish a sample of a fully painted window, as was required by the specifications, prior to the delivery and installation of the windows and the beginning of the application of the finish coat of paint.
When this matter was called to the attention of the Project Engineer, the plaintiff was notified that the shop coat of paint was unsatisfactory, and that the windows which had been treated with the spray gun method would have to be done over by the removal of the shop coat in order to conform to the terms of the contract.
After several attempts to arrive at a method which would be satisfactory to the Project Engineer and the plaintiff, whereby the plaintiff would be saved from a substantial additional expense, it was determined that defendant would accept windows without the removal of the entire shop coat provided plaintiff would do certain work on the windows by sanding them and applying lacquer and glycerine. In the meantime plaintiff had removed the entire shop coat on approximately 1,300 windows and applied a new shop coat at a cost of $1,879.34. Plaintiff seeks to recover that amount.
*729 The whole cause of the expense in question was due to the fact that plaintiff’s subcontractor did not comply with the terms of the specifications, which provided for the application of one heavy prime coat of paint guaranteed to provide a satisfactory base for the subsequent coat of paint specified.
This case is distinguished from the situation involved in Struck Construction Co. v. United States, 96 C. Cls. 186, where the plaintiff followed the defendant’s directions not only in the materials to be used but also in the method of their use, but was unable to satisfy the defendant with the results. We held that the defendant had been unreasonable in its.demands under the specifications. In the instant case the plaintiff failed to do the work in accordance with the specifications. Recovery of the additional expense claimed is accordingly denied.
The further claim for damage for delay due to the controversy must also be denied. The extensions of time requested were granted and the contract completed within the time limit as extended by the requests. No liquidated damages were assessed. The record does not justify any other allowance to plaintiff.
The petition is dismissed. It is so ordered.
Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
Jones, Judge, took no part in the decision of this case.