Dtjbeee, Judge,
delivered the opinion of the court:
This suit is for costs and termination damages which plaintiff alleges arose out of defendant’s termination of a contract. Defendant counterclaims for damages arising from the contractor’s wrongful default, and for the excessive use of Government supplied materials.
Plaintiff is trustee in bankruptcy for Greenstreet, Inc. In 1950, Greenstreet bid on a supply contract to provide field j ackets for the Army. Proposed quantities and delivery dates were set forth in the Invitation to Bid. Although Greenstreet had no prior experience in the production of field jackets, it nevertheless was awarded the contract on December 23, 1950. The contract was for 100,000 jackets, the first 15,000 to be delivered by January 21,1951. Green-street, expecting to receive the contract, had been preparing for performance. It had ordered 87 pieces of additional equipment, had arranged to increase its factory space, and had negotiated the hiring of a larger, experienced work force.
The award telegram was received on Friday, December 22, 1950, but Greenstreet was unable to contact the Government Procurement Agency which was to supply materials, and was therefore unable to provide shipping instructions until December 26. The carrier named by Greenstreet was unacceptable ; a new carrier was designated, and the first consignment of materials was received on January 2, 1951.
*510 Under the contract, a preproduction sample was required. The sample jacket was submitted on January 22, 1951, and was disapproved. Though six different defects were reportedly found in the garment, Greenstreet was advised to proceed with production while correcting the errors.
Production problems were immediately encountered. A discussion of the various problems is included in the findings. The most serious of these arose after Greenstreet had machine-sewed buttons into place as directed by Operation No. 26 of Military Specification MIL-J-843 (29 July 1949). Operation No. 33 required stitching along and approximately two inches from the front edge of the fly. The stitching could not be machine-performed after the buttons were in place. Other contractors, when faced with the same problem, had placed the stitches only 1% inches from the edge, and no objection had been forthcoming from the Quartermaster Corps. But this fact was not known to Green-street. Greenstreet requested permission to deviate, and when no reply was received within a reasonable time, Greenstreet reworked a number of jackets. The buttons were removed by hand, the stitching was put in, and the buttons were replaced by hand. As this process was too time-consuming and costly Greenstreet deviated from the specifications to allow machine performance of these operations on subsequent production. No objection to the deviation was made.
Correction of this and other production problems delayed any January delivery.[1] The first lot of completed jackets was submitted on February 16, 1951. Forty garments were selected from the 1,540 submitted. Of these forty, twenty-six were found to have defects. The lot was rej ected. After reworking the lot, 1,400 jackets were re-submitted. Forty garments were again selected for inspection, and all forty garments were found to have defects. The lot was rejected.
Greenstreet was now in financial difficulty. Operations could only continue if delivery of the completed jackets were effectuated and payment was received. An appeal to Green-street’s work force was made, and volunteers continued their *511 attempts to correct defects of the rejected lot. While the volunteers were thus engaged, the following communications were exchanged.
On February 20, 1951 the contracting officer sent the following telegram to Greenstreet:
EEUE CONTRACT DA-30-280-51-QM-8638, JACKET, FIELD, WITHOUT LINER, INFORMATION FURNISHED INDICATES THAT PRODUCTION ON THIS CONTRACT HAS STOPPED. INFORM THIS OFFICE BY WIRE AT ONCE AS TO WHEN PRODUCTION WILL RESUME, OR WHAT YOUR INTENTIONS REGARDING COMPLETION OF THIS CONTRACT.
On February 23, 1951, Greenstreet replied as follows by telegram to the contracting officer’s telegram of February 20, 1951:
RETEL WORKING WITH SKELETON CREW TO PREPARE LOT FOR RESUBMISSION FULL SCALE OPERATIONS CANNOT BE REINSTATED UNTIL PROPER FINANCING IS FORTHCOMING
On February 24, 1951, the contracting officer sent the following letter to Greenstreet:
Reference is made to Contract DA-30-280-QM-8638 dated 22 December 1950 for the delivery of 100,000 Jackets, Field without liner, for deliveries commencing 22 January 1951.
In accordance with the provisions of the default article of the contract and by reason of your failure to make deliveries as required under the terms and conditions of the subject contract, your right to deliver the entire contract quantity of 100,000 Jackets, Field without liner, is hereby terminated.
This notice of termination is to be considered as a determination and finding of the contracting officer in accordance with the disputes article of the contract.
The termination notice was received by Greenstreet on February 26, and all work was immediately discontinued. As of that date, 2,500 field jackets had been completed (none had been accepted) and cuttings for an additional 19,860 had been made. No compensation for this work had been paid.
*512 Bankruptcy proceedings were instituted, and on March 14, 1951, the United States filed a reclamation petition as a result of which, defendant recovered the materials furnished Greenstreet, including the finished jackets and the cuttings.
A counterclaim based on the termination of the contract and filed by plaintiff was dismissed by the United States Court of Appeals for the Tth Circuit on jurisdictional grounds.
Meanwhile, defendant contracted for the repurchase of the needed field jackets at a cost increased by $37,034.28.
In August of 1955, four years after the above described events transpired, the trustee in bankruptcy requested the contracting officer to make findings of fact on whether Green-street’s default was excusable, and whether the contract prescribed firm delivery dates. The contracting officer found that the default was not excusable and that the dates were firm. The Armed Services Board of Contract Appeals upheld the contracting officer’s action of terminating the contract on the grounds of Greenstreet’s default. Suit was then filed here.
The question here to be decided is whether Greenstreet or the United States caused the termination of the contract. If we hold that defendant caused the termination, we must then decide the nature of the termination — whether it was breach or termination for convenience. If we hold that Greenstreet defaulted, we must determine whether the default was or was not excusable.
Both parties devote considerable time and energy to a discussion of whether defendant caused delay and whether the delivery dates were firm or merely desirable. But Green-street never requested any extension of time. And while Greenstreet’s failure to meet the January delivery date evoked no adverse action from defendant, which in effect constituted an extension of time, it cannot be said that failure to act in January precluded defendant from acting as it did when the February delivery date was not met. Indeed, looking at the situation as of February 24, it was quite probable that no deliveries could ever be made. Greenstreet well knew that the field jackets were urgently needed — that rapid de *513 livery was at least desirable — that defendant was counting on the contract here in controversy to satisfy its immediate field jacket needs. Yet when defendant requested by wire of February 20 that Greenstreet inform it as to if or when production was to be resumed, Greenstreet replied that “FULL SCALE OPEEATIONS CANNOT BE REINSTATED UNTIL PROPER FINANCING IS FORTHCOMING.” No explanation for this terse communication was offered at that time. Greenstreet offered no indication that proper financing was to be forthcoming. Rather, the very nature of the wire seemed to convey that Greenstreet saw no financial aid in the offing.
The contracting officer took the wire to mean that Green-street not only was unable to come close to the February date, but could no longer operate — that no deliveries were to be forthcoming. He thereupon treated the contract as being in default, and so informed Greenstreet. He was justified in so acting. The delivery dates were firm. Even construing defendant’s failure to enforce the January delivery date as an extension of time, Greenstreet failed to meet the February date; failed to make any effective delivery, and gave every indication that no deliveries would ever be made.
The contracting officer could have terminated the contract due to both his and Greenstreet’s conviction that no substantial deliveries would or could be made — an anticipatory breach and consequent termination, although our conclusion in the case need not be based on such a determination. The Supreme Court in an interesting and enlightening opinion which traces the historical development of the doctrine of anticipatory breach, concluded in Roehm v. Horst, 178 U.S. 1, at 19, 20 (1899) that:
* * * it is proper to consider the reasonableness of the conclusion that the absolute renunciation of particular contracts constitutes such a breach as to justify immediate action and recovery therefor. * * *
As Lord Chief Justice Cockburn observed, in Frost v. Knight, [L.R. 7 Ex. 111], the promisee has the right to insist on the contract as subsisting and effective before the arrival of the time for its performance, and its unimpaired and unimpeached efficacy may be essential to his interests, dealing as he may with rights acquired under it in various ways for his benefit and advantage. *514 And of all such advantage, the repudiation of the contract by the other party, and the announcement that it never will be fulfilled, must of course deprive him. While by acting on such repudiation and the taking of timely measures, the promisee may in many cases a<vert, or, at all events, materially lessen the injurious effects which would otherwise flow from the nonful-fillment of the contract.
Though the rule was stated quite succinctly, it remains to show that the rule finds application in the field of Government contracts and if so, whether it is applicable to the instant case. In Georgia Wholesale Co. v. United States, 84 Ct. Cl. 150 (1936), the doctrine was applied against defendant when this court held that shoes covered by a contract of sale to plaintiff were diverted by defendant to use by Civilian Conservation Corps. This diversion of a part of the contract subject rendered defendant incapable of performing. Plaintiff there was consequently justified in treating the diversion as a breach of contract. Again, in David J. Joseph Co. v. United States, 113 Ct. Cl. 3; 82 F. Supp. 345 (1949), this court held that the unlawful cancellation of a contract by defendant constituted an anticipatory breach for which plaintiff could initiate immediate suit. That defendant too should be able to take immediate action to safeguard its interests when a contract upon which it is relying cannot or will not be brought to fruition, seems obvious.
But did Greenstreet’s telegram of February 20 constitute an “absolute renunciation” of the contract? Was the contract at that time incapable of being performed, as those words are used in applying the doctrine? We think so. The telegram of February 20 clearly and unmistakably informed defendant that no resumption of operations could be contemplated without an immediate infusion of cash into the floundering business. It was certainly not incumbent on defendant to make or arrange for the needed financing. Willems Industries, Inc. v. United States, 155 Ct. Cl. 360, 295 F. 2d 822 (1961), cert. denied, 370 U.S. 903 (1962).
It is not even certain that full-scale operations could have been resumed had defendant secured delivery, accepted, and paid for all the 1,400 jackets being repaired by the skeleton *515 crew. The unit price being $8,025, payment for that first lot would have provided scant operating capital. Yet, defendant was in immediate need of the field jackets. Korean winters are cold, and more and more troops were being equipped and hurried to the front. In view of all the circumstances, we cannot now say that defendant, upon receipt of Greenstreet’s telegram, could not treat the contract as breached and pursue remedial courses of action. As of February 20, plaintiff was incapable of completing the contract and defendant was so apprised.
We must now discuss the question whether the default was excusable. If excusable, defendant’s counterclaim for damages computed on the basis of the increased price of the re-supply contract must fail, and plaintiff may recover for the jackets and cuttings awarded to defendant in the bankruptcy proceedings.
From an analysis of all the circumstances in this case, we must conclude that the default was not excusable. While it is true that some delay was caused by defendant, it is also true that Greenstreet was allowed sufficient time to compensate for the delay. The principal reasons for Green-street’s inability to produce and deliver were the company’s inexperience in the field-jacket production business, and in Government-contract work; undercapitalization; and over-extension of credit. Defendant’s counterclaim for the additional costs it incurred in reletting the contract must be granted. Plaintiff’s claim for compensation for the jackets and cuttings awarded defendant in the bankruptcy proceedings must be denied, since defendant’s receipt of these items affected and mitigated its damages, the mitigation being tacitly liquidated in the price of the relet contract.
Defendant’s counterclaim for excessive use of Government materials is not supported by the evidence, and is therefore denied.
Accordingly, and upon the Commissioner’s findings of fact which are hereby adopted as the findings of the court, plaintiff’s claim is denied and the petition is dismissed; defendant’s counterclaim for damages arising from the increased cost of reletting the contract is granted in the amount of $37,034.28 and judgment is entered for defendant in this *516 amount; defendant’s counterclaim for excessive use of Government materials is .denied and dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastin G. White, and the briefs and argument of counsel, makes findings of fact as follows:
FINDINGS OF FACT

The contractor

1. (a) Greenstreet, Inc. (which will usually be referred to hereafter in the findings as “Greenstreet”) was at all times pertinent to this litigation a corporation organized and existing under the laws of the State of Illinois. Greenstreet was organized in September or October of 1948. It was engaged in the business of manufacturing woolen coats and suits for ladies. Greenstreet’s gross sales for the first year amounted to a figure somewhere between $1,250,000 and $1,500,000; and its gross sales for the second year amounted to approximately $2,500,000.
(b) Prior to obtaining the contract that is involved in the present case, Greenstreet had not done any work for the Government, and it had not manufactured any cotton garments.

The contract

2. (a) Under the date of November 14, 1950, the New York Quartermaster Procurement Agency of the Department of the Army (hereinafter referred to as “the Procurement Agency”) issued an invitation for bids (No. QM-30-280-51-783) on the manufacture and supply of 962,010 field jackets, without liners, conforming to the “requirements set forth in Military Specification MIL-J-843, dated 29 July 1949,” with certain specified exceptions. The invitation stated that bids would be received by the Procurement Agency until 11:30 a.m. on December 4,1950, at which time the bids would be publicly opened.
(b) With respect to the subject of deliveries, the invitation for bids stated as follows:
*517 SCHEDULE OF DELIVERY
December 1950 January 1951 February 1951 March 1951 140,000 Each 245,000 each 280,000 Each 297,010 Each

Acceleration of deliveries to the greatest extent possible is desired.

NOTE:
a. The delivery schedule above is the minimum desired schedule. Delivery in full is required as soon as possible.
b. Bidders are permitted to offer an alternate schedule if the one above cannot be met. Prices and all other conditions being equal, preference and award will be given to the bidder offering the most accelerated schedule.
c. If bidder offers alternate schedule, complete the following:

Quantities by Months

December 1950 January 1951 February 1951 March 1951

(c) The invitation for bids stated that the cotton cloth and the cotton webbing to be used in the manufacture of the field jackets would be furnished by the Government. In this connection, the invitation provided in part as follows:

Availability of Government Furnished Property

The following schedule of availability will apply:
15% of Contract Requirement will be initial shipment. 13% Additional 15 days after initial shipment.
13% Additional 30 days after initial shipment.
15% Additional 45 days after initial shipment.
14% Additional 60 days after initial shipment.
15% Additional 75 days after initial shipment.
15% Additional 90 days after initial shipment.
Bidder will furnish shipping instructions for shipment of Government Furnished Materials within forty-eight hours after receipt of Notice of Award. Upon receipt of such instructions, the Government will deliver the material as listed above.
Also, the “Additional General Provisions,” which were attached to and formed part of the invitation for bids, provided in clause 32(a) (among other things) as follows:
* * * The dates fixed for the contractor’s performance of this contract are based upon the expectation that the *518 [Government-furnished] Property will be furnished to the contractor at the times stated, or if no times are stated, in sufficient time to enable the contractor to meet such dates. In the event that any Property is not furnished to the contractor at such time the contracting officer shall, if duly requested by the contractor, make a determination of the delay occasioned the contractor thereby and an equitable adjustment on account of such delay under the section of this contract entitled “Changes”, provided, however, that the Government shall not be liable to the contractor for, and no such adjustment shall include, consequential damages or loss of profit.
(d) The invitation for bids provided in part as follows with regard to the subject of “Preproduction Sample”:
Before production is commenced, a sample of the finished end-item shall be submitted for approval to the Commanding Officer, Philadelphia Quartermaster Depot, 2800 South 20th Street, Philadelphia 45, Pa. * * *
(e) Under the heading of “Notice of Award,” the invitation for bids stated as follows:
The Government will endeavor to forward the Award at least 30 calendar days prior to the first scheduled delivery date. Each delivery period will be extended by the number of calendar days that the forwarding of the Award is delayed and the Award shall set forth the amended delivery schedule.
(f) Clause 2 of the “General Provisions,” which were attached to and formed part of the invitation for bids, covered the subject of “Changes,” and provided as follows:
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be as *519 serted within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any túne prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
(g) Clause 11 of the “General Provisions” related to the subject of “Default,” and provided in part as follows:
(a) The Government may, subject to the provisions of paragraph (&) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:
(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or
(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.
(5) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to * * * acts of the Government * * *.
(c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services * * *.
* * * * *
(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this con *520 tract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (&) of this clause,. such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled “Termination for Convenience of the Government,” and the rights and obligations of the parties hereto shall in such event be governed by such clause. * * *
(h) Clause 12 of the “General Provisions” related to the subject of “Disputes,” and provided in part as follows:
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary [of the Army], and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. * * *
(i) Clause 26 of the “Additional General Provisions” related to the subject of “Termination for Convenience of the Government,” and provided in part as follows:
(a) The performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interests of the Government. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.
j[í
(c) After receipt of a Notice of Termination, the Contractor shall submit to the Contracting Officer its termination claim, in the form prescribed by the Contracting Officer. Such claim shall be submitted promptly but in no event later than one year from the effective date of termination, unless one or more extensions in *521 writing are granted by the Contracting Officer upon request of the Contractor made in writing within such one year period or authorized extension thereof. Upon failure of the Contractor to submit its termination claim within the time allowed, the Contracting Officer shall determine, on the basis of information available to him, the amount, if any, due to the Contractor by reason of the termination.
(d) Subject to the provisions of paragraph (c), the Contractor and the Contracting Officer may agree upon the whole or any part of the amount or amounts to be paid to the Contractor by reason of the total or partial termination of work pursuant to this clause, which amount or amounts may include a reasonable allowance for profit, but only on work done in connection with the terminated portion of the contract. The contract shall be amended accordingly, and the Contractor shall be paid the agreed amount. Such amendment shall be final and conclusive upon the Contractor and the Government. Nothing in paragraph (e) of this clause, prescribing the amount to be paid to the Contractor m the event of a failure of the Contractor and the Contracting Officer to agree upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this clause, shall be deemed to limit, restrict, or otherwise determine or affect the amount or amounts which may be agreed upon to be paid to the Contractor pursuant to this paragraph (d).
(e) In the event of the failure of the Contractor and the Contracting Officer to agree as provided in para-?raph (d) upon the whole amount to be paid to the lontractor by reason of the termination of work pursuant to this clause, the Government, but without duplication of any amounts agreed upon in accordance with paragraph (d), shall pay to the Contractor the amounts determined as follows:
(1) For completed supplies accepted by the Government and not theretofore paid for, a sum equivalent to the aggregate price for such supplies computed in accordance with the price or prices specified in the contract, appropriately adjusted for any saving of freight or other charges;
(2) The total of:
(i) the costs incurred in the performance of the work terminated, exclusive of any costs attributable to supplies paid, or to be paid for under paragraph (e) (1) hereof;
*522 (ii) tbe cost (which may include a reasonable allowance for profit to subcontractors or vendors, but only on work done in connection with the terminated portion of any subcontract or order) of settling and paying claims arising out of the termination of work under subcontracts or orders, * * * which are properly chargeable to the terminated portion of the contract (exclusive of amounts paid or payable on account of supplies or materials delivered or services furnished by subcontractors or vendors prior to the effective date of the Notice of Termination, which amounts should be included in the costs payable under (i) above) * * *;
(iii) a sum equal to 2% of that part of the amount determined under (i) which represents the cost of articles and materials not processed by the Contractor, plus a sum equal to 8% of the remainder of such amount, but the aggregate of such sums shall not exceed 6% of the whole of the amount determined under (i) above.
(3) The reasonable costs of settlement, including accounting, legal, clerical, and other expenses reasonably necessary for the preparation of settlement claims and supporting data with respect to the terminated portion of the contract and for the termination and settlement of subcontracts thereunder, together with reasonable storage, transportation, and other costs incurred in connection with the protection or disposition of termination inventory. * * *
(f) The Contractor shall have the right of appeal, under the clause of this contract entitled “Disputes,” from any determination of the amount due to the Contractor made by the Contracting Officer under paragraphs (c) or (e) above, except that if the Contractor has failed to submit its claim within the time provided in paragraph (c) above and has failed to request extension of such time, he shall have no such right of appeal. In any case where the Contracting Officer has made a determination of the amount due under paragraph (c) or (e) above, the Government shall pay to the Contractor the following: (i) if there is no right of appeal hereunder or if no timely appeal has been taken, the amount so determined by the Contracting Officer, or (ii) if an appeal has been taken, the amount finally determined on such appeal; any such determination being final and conclusive upon the Contractor and the Government.
(g) In arriving at the amount due the contractor under this clause there shall be deducted (1) all unliqui- *523 dated advance or other unliquidated payments on account theretofore made to the Contractor, (2) any claim which the Government may have against the Contractor in connection with this contract, and (3) the agreed price for, or the proceeds of sale of, any materials, supplies or other things kept by the Contractor or sold, pursuant to the provisions of this clause, and not otherwise recovered by or credited to the Government.
3. (a) In response to the invitation for bids mentioned in finding 2, Greenstreet submitted a bid under the date of December 1, 1950. In its bid, which was prepared on a copy of the invitation, Greenstreet offered to manufacture and supply 350,000 field jackets at a unit price of $3,025 each, or a total of $1,058,750. Greenstreet’s bid allowed a period of 10 days from the date of the opening of the bids (i.e., from December 4, 1950) for the acceptance of the bid.
(b) With respect to the subject of deliveries (see finding 2(b)), Greenstreet utilized the blank spaces under “ January 1951,” “February 1951,” and “March 1951” in paragraph “c” of the “Schedule of Delivery” in order to offer an alternate delivery schedule that provided for deliveries of 75,000 field jackets in January 1951,125,000 field jackets in February 1951, and 150,000 field jackets in March 1951.
(c) Greenstreet’s bid stated that it did not agree “to accept an award for a quantity of any item or sub-item less than the quantity bid upon.”
4. On or about December 11, 1950, Colon S. Dixon, the Procurement Agency’s purchasing agent for this procurement, requested all bidders to extend the period for the acceptance of bids. Pursuant to this request, Greenstreet on December 11, 1950, extended for 7 days, or until December 21, 1950, the time for the acceptance of its bid. There was no discussion of delivery dates between Greenstreet and the Procurement Agency at that time.
5. A pre-award survey of Greenstreet’s plant was made by a representative of the Procurement Agency on December 15,1950. Upon the basis of the survey, the Procurement Agency’s representative recommended “that this bidder be awarded the quantity of 100,000 units only under this bid in period January 1951 through March 1951.”
*524 6. On December 18, 1950, Greenstreet sent tbe following telegram to tbe Procurement Agency:
AFTER CAREFUL AND FURTHER CONSIDERATION OF THE QUANTITY WE BID ON INVITATION QM 30-280-51-783 WE REQUEST THAT YOU CUT THIS QUANTITY TO 100,000
7. On December 22, 1950, Captain Eric C. Farnell, the Procurement Agency’s contracting officer, sent tbe following telegram to Greenstreet:
REURBID INVITATION QM-30-280-51-783, PURCHASE AUTHORIZATION P/D NY-1-0149-00-1-07 YOU ARE AWARDED CONTRACT NUMBER QM 8638, OI 8662, JACKET, FIELD, WITHOUT LINER, 100,000 EACH AT 3.025 TOTAL $302,500.00. TERMS NET. DELIVERIES 14,546 22 JANUARY 1951, 25,503 22 FEBRUARY 1951, 29,092 22 MARCH 1951, 30,859 22 APRIL 1951. THIS NOTICE OF AWARD RESULTS IN BINDING CONTRACT. FORMAL CONFIRMATION (STANDARD FORM 26) WILL BE FORWARDED TO YOU IN A FEW DAYS. THE CONTRACT CONSISTS OF THE FOLLOWING DOCUMENTS INCLUDING ANY CONTINUATION SHEETS THERETO (A) THE GOVERNMENT’S INVITATION FOR BIDS AND YOUR BID (B) THE SCHEDULE (C) THE GENERAL PROVISIONS AND (D) THE GOVERNMENT’S AWARD.
8. (a) The formal award (Standard Form 26) of supply contract No. DA-30-280-QM-8638 to Greenstreet following the invitation and bid mentioned in previous findings was signed by the contracting officer under the date of December 22, 1950, but was not forwarded to Greenstreet until January 8,1951.
(b) The formal award stated that the delivery schedule would be as follows:
14,546 22 January 1951[2]
25,503 22 February 1951[3]
*525 29,092 22 March 1951[4]
30,859 22 April 19514
(c) The formal award contained the following statement:
This Award consummates the contract, which consists of the following documents, including any Continuation Sheets thereto: (a) the Government’s Invitation for Bids and your Bid, (b) the Schedule, (c) the General Provisions, and (d) the Government’s Award. No further contractural document is necessary.
(The documents mentioned in the preceding quotation from the formal award will sometimes be referred to collectively in subsequent findings as “the contract.”)
9. In a letter dated January 2,1951, from the contracting officer to Greenstreet, the former stated as follows:
Delivery of the items provided for under the above indicated contract is required for the support of possible Korean operations this winter and must be accomplished as quickly as is possible. Your cooperation is urgently requested in an all-out effort to furnish these combat supplies at the earliest possible date.
It is requested that you review your facilities and commitments with the idea of rescheduling your production in order to give every priority possible to the delivery of these vitally needed supplies.
This office would appreciate knowing the extent of possible acceleration you may be able to offer by utilizing maximum production.
This letter is your authority to effect maximum acceleration without increased costs to the Government.
We appreciate any cooperation you may be able to offer, and are confident of your patriotism in assisting your Armed Forces in the present emergency.

Greenstreet''s 'preliminary preparations

10. After the bids were opened on December 4, 1950, Greenstreet expected to receive an award on its bid. Accordingly, sometime prior to December 15, 1950, Greenstreet placed an order for 87 additional pieces of equipment, and it made arrangements to increase its factory space from the 10,000 square feet of space which it had previously rented *526 to a total of 22,000 square feet of rented space. Also, Green-street on December 15, 1950, made arrangements with, the cotton division of the International Ladies’ Garment Workers’ Union for the subsequent employment of workers who were experienced in the manufacture of cotton garments. The wage rates for such workers were lower than the wage rates which Greenstreet had been paying to the more highly skilled persons whom it had previously employed to work on woolen coats and suits.

The furnishing of materials and patterns hy the Government

11. The award telegram referred to in finding 7 was received by Greenstreet at about 4 p.m. on Friday, December 22,1950. Greenstreet promptly endeavored to reach Colon S. Dixon at the Procurement Agency on the telephone in order to give him shipping instructions relative to the materials that were to be furnished by the Government (see finding 2(c)). However, Greenstreet’s telephone call on the afternoon of December 22 was not answered at the Procurement Agency, as that agency was closed in anticipation of the weekend and the Christmas holidays. Because of the intervention of the weekend and the Christmas holidays, Greenstreet was not able to get in touch with Mr. Dixon relative to the matter of the shipping instructions for Government-furnished materials until December 26, 1950. At that time, Mr. Dixon asked Greenstreet to designate a carrier for the transportation of the Government-furnished materials, and Green-street did so. During the course of the conversation, Greenstreet complained to Mr. Dixon about the delay that was occurring in the delivery of Government-furnished materials. Mr. Dixon stated that the delivery date of the contract would be extended for every day that the Government-furnished materials were late.
12. On December 26,1950, the contracting officer forwarded to Greenstreet by special delivery a set of master patterns dated September 22, 1950, for Military Specification MIL-J-843 (29 July 1949), with the exceptions indicated in the contract documents.
13. A few days after December 26, 1950, the Procurement Agency informed Greenstreet that the carrier previously *527 designated by Greenstreet for the transportation of Government-furnished materials was not acceptable to the Procurement Agency, and that Greenstreet should designate another carrier or carriers. Greenstreet did so.
14. The first consignment of Government-furnished cotton cloth to be used in manufacturing the field jackets under the contract was shipped to Greenstreet on December 30, 1950, and was received by Greenstreet on January 2,1951.
15. (a) The first shipment of Government-furnished cotton webbing, which was needed in connection with the pocket-making operation on the field jackets, was received by Green-street on January 9,1951.
(b) The evidence does not establish that Greenstreet’s overall preparations to manufacture field jackets under the contract were delayed by reason of the fact that the Government-furnished cotton webbing referred to in paragraph (a) of this finding was not received by Greenstreet until 7 days after the receipt of the Government-furnished cotton cloth referred to in finding 14. Greenstreet’s preparatory work was apparently in full progress during the 7-day period (see finding 16).

Greenstreet completes its preparations

16. Subsequent to the receipt of the award telegram on December 22, 1951 (see finding 7), Greenstreet proceeded with its preparations for the performance of the contract. It made arrangements for financing the purchase of the additional equipment (see finding 10) by borrowing approximately $30,000 from the Mercantile Discount Corporation. This loan was secured by a chattel mortgage on Greenstreet’s equipment, and the indebtedness was to be liquidated out of the money received by Greenstreet under the Government contract. As the new equipment was received, it was installed, and Greenstreet’s previously owned equipment was rearranged, in such a way as to provide for the manufacture of the field jackets on a highly sectionalized, mass-production basis. In a sectionalized operation for the manufacture of clothing, various groups of employees are taught to perform different functions — e.g., one group will be taught to make collars, another group will be taught to *528 make sleeves, etc. — and the pieces of equipment required for these different activities are arranged so as to facilitate the flow of the work in logical sequence. The process of installing the new equipment and rearranging the previously-owned equipment was completed by Greenstreet sometime between January 5 and 10,1951. Also, Greenstreet acquired the materials which it was to furnish in manufacturing the field jackets, and it hired workers through the cotton division of the International Ladies’ Garment Workers Union. Greenstreet was ready to begin the production of field jackets under the contract on or about January 15, 1951.
17. (a) The work force employed by Greenstreet for the manufacture of the field jackets consisted of 281 employees as of January 19,1951,276 employees as of January 26,1951, 276 employees as of February 2, 1951, and 290 employees as of February 16, 1951. These employees, when engaged by Greenstreet, were experienced in the manufacture of cotton garments, but they were without previous experience in the manufacture of field jackets.
(b) The manufacturing operations under the contract were performed on a 2-shift basis. The first shift worked from 7:30 a.m. until 3:30 p.m. The second shift worked from 4 p.m. until 11:30 p.m., or sometimes until midnight.

The ^reproduction sample

18. On January 22,1951, Greenstreet submitted a sample field jacket to the Philadelphia Quartermaster Depot (see finding 2(d)). The sample jacket was not a custom-made garment, but a garment which had come through the regular production line.
19. The sample field jacket referred to in finding 18 was disapproved by the Philadelphia Quartermaster Depot in a report dated February 1, 1951, which pointed out six different defects that had been found in the garment. The report stated that it was an advisory report only, and did not constitute acceptance or rejection of goods tendered under the contract.
20. On February 2, 1951, after Greenstreet received the report referred to in finding 19, Greenstreet was orally advised by the Procurement Agency’s resident inspector at *529 Greenstreet’s plant to proceed with its production of field jackets and to correct the errors in the manufacture of the garments. No further sample garment was submitted by Greenstreet to the Philadelphia Quartermaster Depot, and none was required by the Quartermaster Corps.
21. The evidence does not establish that Greenstreet’s manufacturing operations were delayed by any action or delay on the part of the Quartermaster Corps in connection with the sample field jacket referred to in findings 18-20.

The 'problem of the breaking thread

22. In the early stages of its manufacturing operations, Greenstreet encountered difficulty, and it lost a considerable amount of time, because the thread which it was using in the manufacture of the field jackets, and which complied with the pertinent specification of the contract, constantly broke. This problem was solved when the Procurement Agency’s regional supervisor, on one of his trips to Green-street’s plant, suggested that Greenstreet dip the thread in oil. The suggestion was followed by Greenstreet, and it did not experience any further difficulty with respect to the breaking of the thread.

The problem of the buttons and the fjy stitching

23. Greenstreet also encountered difficulty in the performance of operations Nos. 26 and 33, as prescribed in Military Specification MÍL-J-843 (29 July 1949). Operation No. 26 provided in part that the contractor should:
Sew three 34 line buttons on the inside of left fly facing through buttonhole fly lining piece as indicated by marks on left facing patterns.[5]
Operation No. 33 was described as follows:
Stitch back edge of fly. — Single stitch through left front about 2y2 inches back of front edge, through front, silesia linings, and f acing with the ends of the stitching at top tacked with triangular tacking. In sizes 34 and *530 36 [tbe sizes manufactured by Greenstreet] the stitching of fly shall be approximately 2 inches back of front edge.
Greenstreet performed operation No. 26 on hundreds of field jackets by machine-sewing the buttons on the inside of the garments at the places required by the specification. Then, when it attempted to perform operation No. 33 on these jackets, it discovered that the buttons interfered with and prevented the placement of the stitching in the location required by the specification, i.e., approximately 2 inches back of the front edge of the fly.
24. Prior to the time that is involved in this litigation, many field jackets had been made by manufacturers other than Greenstreet under contracts requiring conformity with Military Specification MIL-J-843 (29 July 1949). Such manufacturers had solved the problem referred to in finding 23 with respect to the smaller-sized garments by placing the stitching (operation No. 33) in such a way that it just missed the edge of the sewed-on buttons (operation No. 26), even though the stitching was only about 1% inches back of the front edge of the fly. The Quatermaster Corps had acquiesced in this procedure by other manufacturers. However, Greenstreet was unaware of the prior practice.
25. Greenstreet’s president went to Washington, D.C., and on January 26, 1951, discussed with headquarters personnel of the Quartermaster Corps the problem with the buttons and the stitching mentioned in finding 23. During the course of the conference, it was suggested to Greenstreet’s president that Greenstreet submit to the Procurement Agency a request for permission to deviate from the requirements of the specification respecting operations Nos. 26 and 33.
26. (a) It was Greenstreet’s view, after the conference in Washington mentioned in finding 25, that the best solution to the problem referred to in finding 23 would be to do the stitching called for by operation No. 33, and then perform operation No. 26 by machine-sewing on the buttons, although the anchor stitch from the button-sewing operation by machine would be visible on the other side of the garment. With respect to the garments on which the buttons had already been sewn, it would be necessary under Green- *531 street’s plan to remove the buttons by hand, then perform the stitching operation, and then resew the buttons by machine.
(b) Accordingly, Greenstreet on January 27, 1951, sent the following telegram to Colon S. Dixon at the Procurement Agency:
EETEL CONVERSATION[6] PERMISSION IS REQUESTED TO SEW TPIREE BUTTONS INSIDE LEFT FACING THROUGH JACKET BECAUSE WHEN BUTTONS ARE * * * IN PLACE FLY FRONT CANNOT BE TOP STITCHED PLEASE WIRE REPLY COLLECT
(c) Greenstreet’s telegram of January 27, 1951, was referred by Colon S. Dixon to a Deviation Board that had been established by the Procurement Agency.
(d) On February 7, 1951, the Deviation Board notified Colon S. Dixon of its determination, as follows:
Permission not granted to sew the buttons through jacket, but permission is granted * * * to move over the line of stitching in order that the fly front can be top stitched.
(e) For some reason that is not explained in the evidence, neither Colon S. Dixon nor anyone else at the Procurement Agency ever informed Greenstreet of the action that had been taken by the Deviation Board on Greenstreet’s request for permission to deviate from the requirements of the specification relative to operations Nos. 26 and 33.
27. When Greenstreet failed to receive within a reasonable time a response to its request of January 27, 1951, for permission to deviate from the requirements of the specification respecting operations Nos. 26 and 33, Greenstreet reworked the large number of field jackets on which buttons had already been sewn. This was done by removing the buttons by hand, performing the stitching operation, and then resewing the buttons by hand. This caused considerable delay in the completion of the garments and it added to Greenstreet’s manufacturing costs. With respect to the *532 subsequent production of field jackets, Greenstreet decided to deviate slightly from the requirements of the specification with respect to the placement of the buttons (operation No. 26) and the stitching (operation No. 33), so that the buttons could first be sewed on by machine and the stitching operation could then be performed without running into the buttons. No objection was ever made by the Quartermaster Corps because of this deviation.

The problem of the extra-long facing

28. Greenstreet’s working patterns for use in the manufacture of field jackets under the contract were made from the master set of patterns that had been furnished to Green-street by the Quartermaster Corps (see finding 12). Each of the working patterns made by Greenstreet was checked and approved by the Procurement Agency’s resident inspector at Greenstreet’s plant. These working patterns were then used by Greenstreet in making cuttings of Government-furnished cloth for the various parts of the garments. Each cutting operation was inspected and approved by the Procurement Agency’s resident inspector.
29. When the various cuttings for the field jackets were assembled and sewn together in order to make complete garments, it was discovered that the facing of each jacket was longer by about three-eighths of an inch than the corresponding outer part of the garment. In order to correct this discrepancy, Greenstreet had its operators use scissors and cut off the extra length of the facing by hand. This trimming operation by hand represented extra work that had not been contemplated by Greenstreet as part of the mass production of the field jackets under the contract. It added to the time and to the cost anticipated by Greenstreet for the manufacture of the garments.
30. The discrepancy between the patterns for the facing and for the corresponding outer part of the field jacket was called to the attention of Colon S. Dixon and other officials of the Procurement Agency by Greenstreet at a conference in New York City sometime in late January or early February 1951. However, the personnel of the Procurement *533 Agency declined to take any corrective action, it being the position of the Procurement Agency that the patterns were correct.

No delivery in Ja/nuary 1951

,31. Greenstreet did not deliver any field jackets under the contract during the month of January 1951, or submit during that month any lot of completed field jackets to the Procurement Agency’s resident inspector at Greenstreet’s plant for inspection and acceptance.
32. On January 30, 1951, Greenstreet wrote a letter to the contracting officer, and stated in part as follows:
At this point we are pleased to advise you that regardless of the delays which we encountered and which your office is familiar with, we are now operating our plant on two shifts, will make a sizable shipment this week, and from this point on will be in a position to make a sizable shipment almost on a daily basis.
You can be assured that you have our cooperation in this program and that we are doing everything possible to speed deliveries to catch up to the original requested delivery dates and to even outdo them.

Submission of garments for inspection and acceptance

33. Greenstreet submitted its first lot of completed field jackets to the Procurement Agency’s representative at Green-street’s plant for inspection and acceptance on Friday, February 16, 1951. The lot that was submitted for inspection on February 16 consisted of 1,540 garments, although a substantially larger number of field jackets had been completed by Greenstreet as of February 16, 1951. The person who had previously been acting as the Procurement Agency’s resident inspector at Greenstreet’s plant had been transferred from that position shortly before February 16, so the inspection on that day was performed by the Procurement Agency’s regional supervisor. He selected 40 garments from the lot of 1,540 garments, inspected them, discovered that 26 of the 40 garments contained defects, and rejected the entire lot of 1,540 garments. The inspector called the attention of Greenstreet’s officials to the defects that had been discovered *534 in 26 of the 40 garments inspected by him. The defects were largely attributable to the inexperience of Greenstreet’s personnel in working on field jackets. Greenstreet’s officials did not question the propriety or accuracy of the inspection, or the correctness of the inspector’s action in rejecting the lot of 1,540 garments.
34. Greenstreet utilized its work force on Saturday and Sunday, February 17 and 18, 1951, to rework the lot of field jackets that had been rejected by the inspector on February 16 and to correct as far as possible defects of the sort found by the inspector.
35. Pursuant to an arrangement made by Greenstreet with the Procurement Agency, 1,400 of the 1,540 field jackets that had comprised the first lot for inspection were resubmitted by Greenstreet for inspection on Monday, February 19, 1951. By that time, a new resident inspector had been stationed at Greenstreet’s plant by the Procurement Agency, and he performed the inspection on February 19. The inspector selected 40 garments out of the lot of 1,400 field jackets, inspected them, discovered that all 40 garments contained defects, and rejected the entire lot of 1,400 garments. The defects were called to the attention of Greenstreet’s president, who did not question the propriety or accuracy of the inspection, or the correctness of the inspector’s action in rejecting the lot of 1,400 garments.
36. Greenstreet was unable to finance further manufacturing operations under the contract unless it could effect delivery of, and secure payment for, the field jackets which it had completed. This was explained to Greenstreet’s employees at a mass meeting that was held on February 19, 1951, after the inspection referred to in finding 35. Green-street called for volunteers who were willing to continue working in an attempt to correct the defects in the completed field jackets, so that the garments would ultimately pass inspection, be accepted by the Quartermaster Corps, and thus provide a basis for a payment to Greenstreet. Some 30 or 40 workers volunteered for this program, and they were thereafter engaged in the task of correcting defects in the completed field jackets until the contract was terminated, as indicated in subsequent findings.

*535
The termination

37. On February 20, 1951, the contracting officer sent the following telegram to Greenstreet:
REUR CONTRACT DA - 30 - 280 - 51 - QM - 8838, JACKET, FIELD, WITHOUT LINER, INFORMATION FURNISHED INDICATES THAT PRODUCTION ON THIS CONTRACT HAS STOPPED. INFORM THIS OFFICE BY WIRE AT ONCE AS TO WHEN PRODUCTION WILL RESUME OR WHAT YOUR INTENTIONS REGARDING COMPLETION OF THIS CONTRACT.
38. On February 23, 1951, Greenstreet replied as follows by telegram to the contracting officer’s telegram of February 20, 1951:
RETEL WORKING WITH SKELETON CREW TO PREPARE LOT FOR RESUBMISSION FULL SCALE OPERATIONS CANNOT BE REINSTATED UNTIL PROPER FINANCING IS FORTHCOMING
39. On February 24, 1951, the contracting officer sent the following letter to Greenstreet:
Reference is made to Contract DA 30-280-QM-8638 dated 22 December 1950 for the delivery of 100,000 Jackets, Field without liner, for deliveries commencing 22 J anuary 1951.
In accordance with the provisions of the default article of the contract and by reason of your failure to make deliveries as required under the terms and conditions of the subject contract, your right to deliver the entire contract quantity of 100,000 Jackets, Field without liner, is hereby terminated.
This notice of termination is to be considered as a determination and finding of the contracting officer in accordance with the disputes article of the contract.
40. The termination notice quoted in finding 39 was re-received by Greenstreet on February 26, 1951. After the receipt of the termination notice, all work under the contract was discontinued by Greenstreet.
41. (a) As of the time when Greenstreet received the termination notice on February 26, 1951, it had completed approximately 2,500 field jackets under the contract, al *536 though none of them had passed inspection and been accepted by the Quartermaster Corps. Also, Greenstreet had made cuttings for approximately 19,860 additional garments, and had processed these materials to various stages toward the manufacture of complete garments.
(b) Greenstreet has not received any compensation for the work that it did under the contract.
(c) The completed field jackets and the cuttings referred to in paragraph (a) of this finding were ultimately obtained and utilized by the defendant.

Bankruptcy of Greenstreet

42. On February 26, 1951, following the receipt of the termination notice referred to in findings 39 and 40, Green-street filed an assignment for the benefit of its creditors, and John A. Chatz took possession of Greenstreet’s plant that same day as assignee for the benefit of Greenstreet’s creditors.
43. On March 14, 1951, an involuntary petition in bankruptcy for Greenstreet was filed in the United States District Court for the Northern District of Illinois, Eastern Division. James E. Kennedy qualified, and is at present serving, as trustee in bankruptcy for Greenstreet. He filed the present action in that capacity.
44. (a) On March 14, 1951, the United States filed a reclamation petition in the bankruptcy proceedings, seeking to recover the Government-furnished materials that were in the possession of the bankrupt Greenstreet.
(b) On March 23, 1951, James E. Kennedy, as receiver for the bankrupt Greenstreet, filed an answer and counterclaim to the reclamation petition. The counterclaim was based upon the termination of the contract that is involved in the present litigation.
(c) Asa result of the petition referred to in paragraph (a) of this finding, the United States recovered the materials that it had furnished to Greenstreet, including the materials which had been incorporated in completed field jackets or which had been partially processed (see finding 41).
(d) On January 6, 1954, the United States Court of Appeals for the Seventh Circuit held that the Bankruptcy *537 Court did not have jurisdiction to determine the counterclaim mentioned in paragraph (b) of this finding.

Rep rocurement of field jachéis

45. As of March 28, 1951, the Quartermaster Corps entered into a negotiated contract (No. DA-30-280-QM-13733) with the Cohen-Fein Company of Wilkes Barre, Pennsylvania, for the latter to manufacture and deliver 77,640 field jackets, without liners, at a unit price of $3.502, or a total price of $271,895.28. This contract represented a repurchase against contract DA-30-280-QM-8638, except for the 22,360 garments which Greenstreet had wholly or partially completed (see finding 41). The delivery schedule fixed in the contract of March 28, 1951, called for the delivery of 17,000 field jackets in July 1951, 30,000 field jackets in August 1951, and 30,640 field jackets in September 1951. The field jackets were to conform to the requirements set forth in Military Specification MIL-J-843 (29 July 1949), with specified exceptions. They were to be manufactured from cotton cloth and cotton webbing furnished by the Quartermaster Corps.
46. The contract referred to in finding 45 was completed by the Cohen-Fein Company on November 20, 1951, or 51 days behind schedule.
47. The 77,640 field jackets which the Quartermaster Corps procured from the Cohen-Fein Company under the contract mentioned in finding 45 cost the Quartermaster Corps $37,034.28 more than the same number of garments would have cost if they had been manufactured and delivered by Greenstreet under the contract that is involved in the present litigation.

Adminisiratwe proceedings

48. No steps designed to secure administrative review of the action of the contracting officer in terminating the contract under the date of February 24, 1951, were taken by or on behalf of Greenstreet until August 1, 1955. At that time, the trustee in bankruptcy of Greenstreet requested the successor contracting officer to make findings of fact on the *538 issues as to whether Greenstreet’s default was excusable, as to whether the patterns furnished to Greenstreet by the Quartermaster Corps were defective, and as to whether the contract prescribed a firm delivery schedule.
49. On August 10, 1955, in response to the request mentioned in finding 48, the successor contracting officer made the following findings:
a. That failure to perform the contract did not arise out of causes beyond the control and without the fault or negligence of the contractor,*
b. That the patterns, dated 22 September 1950, conforming to requirements set forth in Military Specification MIL-J-843 dated 29 July 1949 with exceptions, were not defective; and
c. That the contract provided a firm delivery schedule.
50. The trustee in bankruptcy of Greenstreet took an appeal to the Armed Services Board of Contract Appeals from the successor contracting officer’s action of August 10, 1955.
51. In a decision dated February 9,1959, the Armed Services Board of Contract Apeáis upheld the action of the contracting officer in terminating the contract on the ground of Greenstreet’s default.

Greenstreet"1 s costs in partially performing the contract

52. The evidence shows that as of January 31,1951, Green-street had incurred labor costs aggregating $18,735.93 in partially performing the contract. Although the evidence shows that Greenstreet continued to incur labor costs in partially performing the contract until all work under the contract ceased on February 26, 1951, there is no competent evidence in the record respecting the amount of such additional labor costs. However, an inference is warranted that the labor costs during the period February 1-26, 1951, were substantially greater than the amount of $18,735.93 incurred as of January 31, 1951. Hence, a finding in the nature of a jury verdict to the effect that Greenstreet’s total labor costs in partially performing the contract amounted to $45,000 is warranted.
53. The evidence shows that as of January 31,1951, Green-street had incurred other expenses (in addition to labor costs) *539 aggregating $15,942.38 in partially performing the contract. (This amount included depreciation on the machinery that was used in working on the contract.) Although the evidence shows that Greenstreet continued to incur such expenses in partially performing the contract until all work under the contract ceased on February 26, 1951, there is no competent evidence in the record respecting their amount. However, an inference is warranted that the expenses (other than labor costs) during the period February 1-26, 1951, were approximately two-thirds as much as the $15,942.38 incurred as of January 31,1951. Hence, a finding in the nature of a jury verdict to the effect that Greenstreet’s total expenses (other than labor costs) in partially performing the contract amounted to $27,000 is warranted.
54. A finding in the nature of a jury verdict is made that Greenstreet’s costs in partially performing the contract aggregated $72,000 as of the time when all work under the contract ceased on February 26,1951.

Termination charges

55. The evidence fails to establish that after the termination of the contract, Greenstreet (or its receiver or trustee) incurred costs that were properly chargeable against the defendant under the contract, with the exception of accounting expenses in the amount of $275 which were incurred in connection with the preparation of the claim against the Government.

Greenstreet's default

56. The contracting officer’s telegram of December 22, 1950 (see finding 7) and formal award (see finding 8) fixed, with Greenstreet’s implied consent, January 22, 1951, as the final date for the delivery by Greenstreet of the first quota of 14,546 field jackets under the contract. Greenstreet was entitled to a substantial extension of the time for the delivery of the 14,546 field jackets, because Greenstreet’s compliance with this requirement of the contract was interfered with to a considerable extent by acts of the Government. However, Greenstreet was not entitled as a matter of right to have the time for the delivery of the 14,546 field jackets *540 extended until February 24, 1951. Therefore, Greenstreet was in default relative to this requirement of the contract on February 24, 1951; and the contracting officer had the option of terminating the contract because of Greenstreet’s default, or of waiving the default, as was subsequently done in the case of the Cohen-Fein Company’s failure to complete performance under the reprocurement contract on schedule (see findings 45 and 46).

Government’s excess costs

57. The Government’s excess costs in subsequently procuring from another source field jackets which Greenstreet failed to manufacture and deliver under the contract amounted to $37,034.28.

Use of Government-furnished materials

58. The evidence fails to establish that Greenstreet used an excessive amount of Government-furnished materials in its manufacturing operations prior to the termination of the contract.
CONCLUSION OK LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed. It is further concluded that defendant is entitled to recover on its counterclaim for damages arising from the increased cost of reletting the contract in the amount of $37,034.28 and judgment is entered for defendant in this amount. Defendant’s counterclaim for excessive use of Government materials is denied and dismissed.

 The nest delivery date was February 22 when some 25,000 jackets were due.

 A letter dated January 2, 1961, from the contracting officer to Greenstreet notified the latter that it was “required to manufacture and deliver” 14,560 field jackets during January 1951.

 In a communication dated January 12, 1951, the contracting officer informed Greenstreet that it was “required to manufacture and deliver” 25,515 field jackets during February 1951.

 In a letter dated January 24, 1951, the contracting officer informed Green-street that it was “required to manufacture and deliver” 29,085 field jackets during March 1951 and 80,840 field jackets during April 1951.

 The buttons were needed so that a removable liner could be added to the field jacket In cold weather, and then be taken out in warm weather. Green-street was not involved in making liners for the field jackets, but it had to construct the jackets so that the liners could be buttoned in at the appropriate time.

 Mr. Dixon had presumably been informed in advance over tbe long-distance telephone that the request for permission to deviate from the requirements of the specification would be made.