Madden, Judge,
delivered the opinion of the court:
Plaintiff was the successful bidder for the construction, under a contract with the defendant, acting through the Federal Emergency Administration of Public Works, of a state prison in Tattnall County, Georgia. The contract was dated January 12, 1935, and was originally to have been completed by July 12, 1936. The time was extended by the defendant to December 31, 1936, the date of actual completion of the contract, and plaintiff was paid the contract price. Plaintiff claims that it was required to expend additional amounts for material and labor, and was delayed and otherwise damaged by acts of the defendant during the performance of the contract.
Plaintiff’s first claim is with regard to the concrete walls of the prison buildings. The contract contemplated that the walls of seven of the eight buildings should be of “architectural concrete,” that is, that the concrete walls as they stood after the removal of the forms in which the concrete was poured, should, with some touching up of particular spots, be.the finished walls of the building, without being covered with plaster or faced with brick or stone. The contract specified the “mix” which should be used in pouring these walls. It was to be one part of cement, two and one-half parts of sand, and four parts of gravel or stone, with the privilege in the defendant of varying the proportions of sand and gravel for the purpose of obtaining a denser or more workable mix when thought necessary by the defendant’s superintendent. A small photograph of a piece of concrete wall was furnished with the specifications, and it was specified that the finished wall should have a finish equal to that shown in the photograph. The contract required that plaintiff should build a sample wall, seven by ten feet, which, if approved by the defendant should be the standard according to which the permanent walls should be built.
On May 1, 1935, plaintiff poured a sample wall. It used for forms new plyboard of a type authorized by the con *217 tract. When the forms were removed, the wall showed sand streaks where sand, not incorporated in cement, had come to the surface. It also showed small air and water pockets where bubbles of air or drops of water lying next to the forms had prevented the concrete from flattening out against the forms. The defendant’s representatives refused to approve the sample. Another sample wall was poured the next day. The concrete was spaded more to bring it into contact with the forms and to let the air out, as suggested by the defendant’s representatives, but this sample had the same defects and was disapproved. There was correspondence and consultation about what to do. The architect suggested that plaintiff examine the walls of the barracks at Fort Benning, Georgia, which the architect had intended as the standard for the Tattnall job, and plaintiff', the architect, and the project engineer went to Fort Benning to examine the barracks walls. They discovered, according to the architect, that the walls of the barracks were not as smooth as the architect had supposed they were; that more cement had been used in those walls than was specified for the Tattnall work; and that those walls had been painted before the photograph which was attached to plaintiff’s contract was taken.
Plaintiff poured more sample walls, varying the proportions of sand and gravel and following various recommendations of the defendant’s agents, but the defendant refused to approve any of the samples. On June 18,1935, the architect asked plaintiff if it would be willing, without additional compensation, to point up all holes exceeding % of an inch in diameter in a section of wall which plaintiff had poured. Plaintiff said it would, and did so, whereupon the architect approved that wall as a sample. The defendant’s representatives from the Inspection ' Division, however, overruled that approval. Plaintiff advised the defendant that the kind of wall it insisted on could not be made except by using more cement in the mix than was specified, and then doing a “full grouting” job on the wall after the forms were removed. The grouting job suggested consisted of brushing pure or “neat” wet cement onto the entire surface of the wall after the removal of the forms, troweling it so *218 as to force it into the depressions in the wall, and, after it had partially set, scraping the wall with the edge of a trowel to remove all of this cement except what was in the depressions; then rubbing the wall with burlap to take off any excess cement not scraped off with the trowel. Plaintiff told the defendant that for the additional cement in the mix and the cement and labor used in grouting, plaintiff should receive additional compensation to be authorized by a change order.
The defendant curtly advised plaintiff that it did not desire the use of additional cement, nor grouting; that it desired only that plaintiff build satisfactory walls. A section of wall was then poured under the personal supervision of an inspector sent by the defendant from Washington. It, too, turned out to be unsatisfactory.
The first sample wall had been poured May 1, 1935. It was now July. Plaintiff had planned to start on the A and B buildings and complete the concrete work on them from foundation to roof and then transfer its equipment and forms to the F and G buildings, which were identical with the A and B buildings, and pour those. Instead it had been obliged to shift about from one place to another pouring foundations, footings, and other unexposed concrete not involved in the wall controversy.
Plaintiff poured a section of wall on the rear of the A building. It used a mixture of concrete containing more cement than the specifications called for and also did a full grouting job on this section. This wall was inspected by a representative of the defendant from Washington, and on July 24, 1935, plaintiff received from the director of the Inspection Division in Washington the telegram quoted in finding 15. Plaintiff replied as follows: “We accept decision finish concrete surfaces contained in telegram today”; and confirmed the reply by letter.
Plaintiff thereafter built the exposed walls in conformity with the approved sample, i. e., using the rich mix and doing a full grouting job, except in one instance. In September, one of plaintiff’s executives from Louisville visited the job. He found that the rich mix was using more cement than *219 he had anticipated, and directed the superintendent to revert to the mix specified in the contract. One section of wall was poured accordingly, but the project engineer warned plaintiff that the wall was not satisfactory and plaintiff used the rich mix thereafter.
For the richer mix and the grouting, neither of which plaintiff originally contracted for, plaintiff used more cement, and spent more for labor than performance of its original contract would have required. It claims compensation for these extras. The defendant urges that the exchange of telegrams on July 24 bound plaintiff to supply this additional labor and material without additional compensation. Plaintiff replies (1) that it did not by its telegram of July 24 or its letter of the same date, promise that it would do the work without additional compensation; (2) that if it did so promise, its promise was without consideration and was the result of coercion.
We see no merit in plaintiff’s first point. The defendant’s telegram plainly conditioned its approval of the sample wall upon plaintiff’s agreement to furnish the additional labor and materials without additional compensation. Plaintiff could not have replied as it did to this telegram without intending to convey to the defendant the meaning that it was so agreeing.
As to whether there was legal consideration, we conclude that the cement and labor in controversy were additions to what was originally agreed to and not mere modifications to make up for a lack of skill or diligence or both on plaintiff’s part. The law seems to be that if plaintiff had promised as it did in its telegram of July 24, and had then refused to perform that promise, it could have successfully defended a suit for breach of contract on the ground of a want of consideration. See Restatement of Contracts, sec. 75. But if one promises without consideration, and then performs his promise, he would seem to be in no better position, so far as securing compensation for his performance, than one who makes a gift of goods or services, the donee not expecting to pay and the donor not expecting to receive payment. However, in view of our conclusion *220 that plaintiff’s promise to forego additional compensation was invalid for another reason, we do not decide the question of consideration.
As to whether plaintiff was coerced into agreeing to furnish the defendant some $25,000 in materials and labor without compensation, we have concluded that it was, and that its having, in form, agreed to do so, does not destroy the right which it would otherwise have had under article 4 of the contract, to extra pay for extra labor and materials furnished at the defendant’s request.
Coercion sufficient to avoid a contract need not, of course, consist of physical force or threats of it. Social or economic pressure illegally or immorally applied may be sufficient. Be-statement of Contracts, sec. 492, comment g. See Hartsville Oil Mill v. United States, 271 U. S. 43; Hazelhurst Oil Mill Co. v. United States, 70 C. Cls. 335.
A threat made in good faith, to enforce rights which one honestly believes that he has, is not legal coercion, even though those rights are in fact or in law nonexistent. But if one knows that he has not the right which he insists upon, and still by the pressure of his insistence causes another to yield up his rights in order to escape the pressure, that is coercion. ■
In this case, the specifications were plain as to the amount of cement to be put into the walls. The photograph was by no means plain. The architect, who had in his mind a particular kind of wall, conceded after an examination of the photographed wall that it was not like the wall he had in his mind, and that the.wall had been painted before it was photographed, which changed its appearance, and that it had more cement in it than was specified in plaintiff’s contract. In the circumstances, the photograph added substantially nothing to the words of the specifications. And the only reasonable construction of those words was that plaintiff promised to make as good a wall as good workmanship could produce from the specified materials. By the time of plaintiff’s July 24' telegram, it had been demonstrated beyond question that what the defendant was insisting on was not what the speci'fic'ations called for. The fault was not in the workmanship. The defendant’s architect and inspectors had been present *221 when the sample walls were poured. Their suggestions had been made and followed. One section had been built under the personal supervision of an expert of the defendant who had in effect used plaintiff’s workmen and materials to do the job for him. Yet he or his superiors would not approve the result. On June 19 the architect approved a sample wall which, while containing extra cement, was not fully grouted but only pointed. Plaintiff requested extra compensation for the extra cement. The defendant overruled the architect, disapproved the wall and said “We neither expect nor desire you to change the cement ratio in the concrete and do not approve of your doing so. The Government will allow no extra for the alleged extra cement claimed to be used.” Yet on July 24, the defendant approved a sample wall which it knew contained extra cement and had been fully grouted, but in giving its approval stipulated for no extra compensation.
It is difficult to apply terms with moral implications, such as “good faith,” to impersonal legal entities such as corporations or governments, especially in situations where they act on one matter through a number of agents. Some of the moral qualities may be lost or diluted as the decision passes from one agent to another. But the test of good faith should be the same for an entity which must act through agents as for an individual acting for himself. If the aggregate of the actions of all of the agents would, if all done by one individual, fall below the standard of good faith, the entity for whom the various agents acted should be held to have violated that standard. It is the responsibility of the entity, the principal, to so coordinate the work of its agents that the aggregate of their actions will conform to required legal standards.
Here the Director of the defendant’s Inspection Division and his staff in Washington and in the field continued to demand of plaintiff a performance which was impossible after repeated demonstrations which should have convinced -them that it was impossible if they had looked at the problem reasonably. They should have been aware that plaintiff’s plans were being disrupted by the delay; that its overhead was being increased; that its contract time was run *222 ning, and, if it should run out before the completion of the contract, plaintiff would be subject to the risk of paying liquidated damages at $250.00 per day; that cancellation of plaintiff’s contract for inability or refusal to perform would cause confusion and loss which plaintiff would, with reason, go far to avoid.
These being the circumstances, the defendant’s agents were careful to refrain from requesting in so many words that plaintiff put in extra cement or do extra labor, lest such a request might have given plaintiff a valid claim for extra compensation. Yet, after having repeatedly refused to approve a sample wall built according to the specifications, they approved a sample which they knew contained extra cement and extra labor, conditioning their approval upon plaintiff’s agreement to forego any claim to be paid extra compensation. This conduct was in fact oppressive. The care which was taken not to appear to ask for more than was due under the contract while in fact insisting on more seems to us, in the circumstances here present, to show'that it was designedly oppressive. We think that it fell below the standard of good faith, that plaintiff’s agreement not to claim additional compensation should be disregarded, and that its claim should be considered on its merits.
It follows from what we have said that plaintiff may recover for the cement and labor used in excess of wdiat would have been necessary to build the walls according to the. specifications. There is no dispute as to the cost of the labor for the grouting job and the items of incidental expense relating thereto as shown in finding 17. As to the amount of extra cement used, the parties disagree. Plaintiff gave evidence of the entire amount of cement brought to the job, the amount used for other purposes than concrete work, and the amount which,* according to computations based on cubic footage and the cement content called for by the plans and specifications, it would have used if it had been permitted to use the specified mix. It then subtracted the latter two amounts from the total and presented the result, 16,247 sacks, as the amount of extra cement, beyond the specifications, which it was compelled to use. This computation made allowance for normal wastage.
*223 The defendant presents a computation made from plain - tiff’s “pour book,” an actual record made at the time the walls were poured of the amount of cement that went into each mix. From this amount is deducted the amount which would have gone in if the leaner mixture called for by the specifications had been used. The excess, according to this computation, is 7,426 sacks of cement. It is probably true that this computation fails to include some extra cement that was used, not in the walls, but in other locations where a continuous pour was required to produce a monolithic structure extending into the walls, and where plaintiff was, for that reason, obliged to use the richer mix. In spite of this defect in the defendant’s evidence, we have concluded that it is a safer guide than plaintiff’s general and “over-all” computation which would impose on the defendant the cost of all extraordinary wastage or use of cement, as well as all risk of miscalculation of the cubic footage of the entire job. Plaintiff was aware, from the beginning, of the controversy about the cement and could have preserved more dependable and specific evidence than it offers here. Computed according to the defendant’s method, the cost of the additional cement was $4,961.86. The total additional cost of cement and grouting, as set out in finding 17, was $26,921.40.
Plaintiff’s second claim is for damages resulting from various delays caused by the defendant. The defendant does not deny that it delayed the completion of the project, but it argues that its delays ran concurrently with delays caused by plaintiff and its subcontractor and that in any event, plaintiff was compensated by three change orders which gave it additional pay and extended the time for performance.
We have found that the defendant in various ways unreasonably delayed the work. These include the delay in the approval of the sample wall (see finding 18); delay in approving and returning shop drawings and samples of materials (see finding 21); the discovery of an error in the elevations, delaying the grading of the west recreation field, and the laying of the sewer (see finding 22); the controversy over the type of couplings to be used in connection ¡with the installation of ¡steam pipes in the *224 tunnels under “H” building (see finding 23); and the strict and arbitrary painting inspection (see finding 24).
Plaintiff was delayed in the completion of the project and its costs were increased as a result of the conduct of ■one of its subcontractors, who, on several occasions, failed to have materials and labor at the site as needed. We have concluded, however, from a consideration of all the ■evidence, that, in addition to the delay caused by the sub■contractor, the amount of delay reasonably attributable to the acts of the defendant amounted to four months.
■ The change orders did not, as the defendant urges, pre■clude plaintiff from seeking damages for delays caused iby the defendant. The first change order, dated April 30, 1986, allowed plaintiff $3,025.00 for relocating the sewer line. The time was extended 45 days to “run concurrently with any other time extensions which may have been or ■may hereafter be filed for such time extensions.” The second change order, dated September 5, 1936, replaced an ■earlier proposed change order which was to have increased the amount authorized under the contract for deep wells from $12,000.00 to $24,000.00. The September change order eliminated the construction of one deep well and reduced the amount authorized to $12,928.00. It concluded with the following statement:
In consideration of the various unavoidable delays encountered in taking bids and awarding of subcontracts for the deep well and deep well pump, an extension of contract time in the amount of 60 calendar days, in addition to any such extension previously granted, is hereby authorized with the distinct understanding and agreement that this extension expressly satisfies all claims and requests for time extension, of whatever nature or purpose, which have been received by the Administration up to and including this date.
The third change order was dated January 6, 1937, and provided for an increase of $2,760.00 to cover the cost of labor and material in the construction of water-softening ■equipment and an extension of time of 67 days, making the ■date of completion December 31, 1937.
These change orders were not intended to include any ■compensation for damages suffered by plaintiff as a result *225 of delays. As to the second one, which reduced plaintiff’s compensation in exact proportion to the reduction in the work to be done under the contract, that is plain beyond question. As to the two others, the small sum allowed plaintiff could not have included, in addition to pay for the extra work and materials, compensation for the long delays recognized by the extensions of time of 45 and 67 days, respectively.
On May 12, 1937, plaintiff executed a release to the defendant, the terms of which are set out' in finding 33. We think that $16,317.98, the amount saved by Item E of the release, entitled “Job overhead and other costs from July 12, 1936, to December 31, 1936,” is the upper limit of what plaintiff can recover as damages for delay of a kind not specifically covered by other headings in the release. We have found the following amounts of such damages attributable to the four months delay caused by the defendant:
Job o verilead-$3, 567. 32
Builder’s risk insurance (4 months)_ 209.01
Cleaning buildings (4 months)_ 2,535.33
Rental value of equipment_ 8, 532. 91
14, 864. 57
Subtracting the above total from the $16,317.98 saved in Item E of the release, leaves $1,453.41 to cover the claim for main office overhead. As to the main office overhead, the Commissioner of this court found that $9,798.08 was properly attributable to the delay on this job. This sum bears the same proportion to plaintiff’s total overhead during the period of delay that plaintiff’s collections on this job during the period bore to its total collections. The defendant objects to this method of computation, urging that there is no necessary relation between collections and activity on the job which would require activity at the main office. It appears, however, that the monthly payments made by the defendant to plaintiff on this job correlated closely with the current use of labor and materials on the job. Indeed, the substantial final payment made in May 1937, and therefore not included in the apportionment of overhead for the period of delay, the job having been completed in 1936, works to plaintiff’s disadvantage under this method of computation. *226 We think therefore that the Commissioner’s method of comr putation was sufficiently accurate.
In connection with its claim for compensation for the extra cement used, plaintiff claimed, and has been allowed, an item of main office overhead, based on a percentage of the cost. Because a part of the work involved in that claim was performed in 1936, there is a duplication, to some unascertained extent, in the two items of main office overhead. No satisfactory basis of segregation is shown in the record. Subtracting the amount allowed in the cement claim leaves $6,-838.49 as the greatest amount that plaintiff could recover for main office overhead in connection with this claim.
The defendant also objects to the inclusion of some items of main office expenditure in the computation of overhead. We have no doubt as to the propriety of any of the items except donations and the cost of the Democratic Committee Year Book. As to these we do not decide since, even if they are excluded, the máin office overhead item would amount to more than $1,433.41, the remaining margin which, as shown above, is all that may be recovered under the release.
We have allowed recovery for the rental value of machines detained on this job by reason of the delay caused by the defendant. We think there is adequate proof that plaintiff could have used the machines elsewhere, had it not been for the delay, and that plaintiff was damaged by reason of their unavailability.
Item F of the release is for “Watchman service” in the amount of $4,769.42. Plaintiff’s claim for furnishing watchmen during the entire time of construction is hereinafter discussed and disallowed, but it is entitled to recover the cost of providing watchmen during the period of delay caused by the defendant. That cost was $583.51.
Item G of the release is entitled “Change in administration of Project.” We think that this item refers to the increased costs which plaintiff claims resulted to it from the fact that the project was supervised from Washington, rather than locally. (See finding 6.) Although delay in the approval of shop drawings and materials was one of the incidents of that system of supervision, there is nothing in the evidence *227 to permit a determination of wbat part, if any, of the amount reserved in Item G is attributable to delay as distinguished from additional work and direct expense caused by the remote supervision. Plaintiff’s recovery on its claim for damages for delay is therefore limited to $16,901.49, that being the sum of $16,317.98 reserved by Item E of the release, plus $583.91, the cost of watchmen during the period of delay, which is a part of what was reserved in Item F of the release.
Plaintiff’s third claim has to do with alleged extra brickwork. The provisions of the specifications relating to this phase of the work appear in finding 28. The brickwork was to be done on the outside wall of the H building. Every sixth course of brick was what is known as a “header course,” ivith the brick running through the wall. The defendant’s inspectors required that the header course be laid with brick of approximately the same length so as to present an even surface on each side of the wall. Since all common brick is not uniform in length, the defendant’s requirements made necessary a careful selection of brick for the header course. Plaintiff also claims that the defendant’s inspectors were too strict in ordering the elimination of brick which had been chipped to any extent. These rulings made the cost to plaintiff of this part of the work greater than it had contemplated. We have concluded, somewhat doubtfully, that plaintiff has not proved that the defendant required more in regard to the brickwork than was called for in the specifications.
Plaintiff’s fourth claim is for the cost of furnishing watchmen. Shortly after work on the project was started, the defendant’s project engineer told plaintiff to keep a watchman on the premises at night and on Saturday and Sunday. Plaintiff protested that the specifications did not call for a watchman and that considering the isolated location of the project and the nature of the materials on the site, a watchman was not necessary. Upon insistence, however, plaintiff complied with the project engineer’s instructions. The provisions of the contract relating to the care of the project are set out in finding 27. In view of these provisions, we have not found that the defendant’s requirement *228 was beyond the fair scope of the contract. We have, however, as hereinbefore indicated, allowed plaintiff the cost of watchmen during the four months’ period of delay.
Plaintiff’s final claim is that it was required to do work not called for by the contract in the preparation of vouchers for monthly payments and that this put it to extra expense. The Inspection Division required plaintiff to furnish unusually elaborate estimates, but, considering the provisions of Article 15 of the General Conditions (see finding 29), we have not found that these requirements went beyond what was permissible under the contract.
Plaintiff is entitled to recover a total amount of $48,822.89. It is so ordered. ■
Jones, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.
Whitaker, Judge, took no part in the decision of this case.