ABCON ASSOCIATES, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–574C.

United States Court of Federal Claims.

June 29, 2001.

Order Granting Reconsideration
July 16, 2001.

Jon N. Kulish, Washington, DC, for plaintiff. Louis N. Haas, Haas & Najarian, San Francisco, CA, of counsel.

Michael F. Kiely, Washington, DC, with whom was Acting Assistant Attorney General Stuart E. Schiffer, for defendant. Karren Dickson Vance, United States Postal Service, of counsel.

## OPINION

MILLER, Judge.

This matter is before the court after trial that addressed two issues: 1) whether a termination for default is improper because the contractor's delay is excusable, and 2) if the

termination for default is proper, whether the default itself is excusable due to the owner's actions and inaction during critical times of the contract performance.[1]

## FACTS

On April 29, 1996, the United States Postal Service (the "USPS") awarded Abcon Associates, Inc. ("plaintiff"), Contract No. 415046–96–B–0050 for the extension of the loading dock and the installation of three freight elevators at the USPS Queens Processing and Distribution Center (the "QPDC") located in Flushing, New York.[2] Under the terms of the contract, plaintiff was to commence performance within ten days of receiving the Notice to Proceed and to complete performance within 510 days. Work under the contract was divided into two phases in order to enable the QPDC to operate during each phase of contract performance.

The first phase to be worked on, Phase 1, was divided further into Phases 1a and 1b. Phase 1a was to commence immediately and be completed by April 1, 1997. Phase 1b was to commence simultaneously with Phase 1a and be completed by December 1, 1996. Phase 2 was to commence on April 1, 1997, and be completed by October 1, 1997.[3] Plaintiff received the Notice To Proceed on May 1, 1996. The Notice To Proceed identified September 23, 1997, which was 510 days from May 1, 1996, as the completion date for all work.

Michael P. Zenobio, Jr., plaintiff's President, described the locations of the different phases while referencing the USPS's design drawings prepared by the engineering firm of Fanning, Phillips & Molnar Enginnering Group, P.C. The phases were noted on draw-ing A–1, "First Floor Demolition Plan at Truck Dock Area," from north to south (left to right, respectively), as follows: Phase 2, column line 12.7 to 16.8, which was outlined in red; Phase 1, column line 16.8 to 21, which was outlined in green; the division between Phase 1a and 1b was marked by a dashed blue line at approximately column line 18.5.[4]

Michael Zenobio then testified to the scope of the contract work: "The [interior] demolition consisted of the removal of the existing dock levelers which are [labeled in green on drawing A–1]; and the removal of a portion of the raised platform that was used for loading and unloading trucks which are depicted by [the] broken [green] line [on A–1] . . . . ." The portion of the raised platform to be removed was the planned location of three elevators and an elevator machine room and was referred to during construction as "the elevator area" or "the elevator pit area."

Additionally, the job required plaintiff to raise the interior floor level from the west of all three phases to be even with the floor level of the pre-existing loading docks on the east, which, in effect, would create new loading docks on the exterior of the building.[5] Raising the floor level required, according to drawing A–8, a new 8–inch reinforced concrete slab on reinforced concrete grade beams with steel pile and concrete packs. The piles (marked in blue on drawing A–8) are vertical in the ground and support the pile caps (marked in green on drawing A–8), which, in turn, support the grade beams that horizontally progress the full width of the building (marked in red on drawing A–8). On the exterior of the building, the design prescribes wooden piles to support the concrete agent that spans all phases.

1. The court previously dismissed Counts III and IV of the complaint on cross-motions for summary judgment. *See Abcon Assocs., Inc. v. United States*, 44 Fed.Cl. 625 (1999).

   The summary judgment ruling held that the USPS did not waive the delivery schedule under the contract and therefore did not wrongfully terminate the contract without affording plaintiff an opportunity to cure. The bifurcated trial addressed the validity of the termination itself.

2. The contract was a "build-to-print fixed-price contract," Pl.'s Br. filed Feb. 9, 2001, at 6, awarded on the basis of competitive bidding.

3. The court found that the Phase 1a and 1b completion dates were merely contract milestones, whereas the Phase 2 end date, October 1, 1997, was the contract completion date.

4. Although both phases consisted of interior and exterior work, drawing A–1 only depicted the interior demolition work.

5. Previously, the USPS trucks backed into the perimeter of the building.

Regarding the exterior, Michael Zenobio explained that "[a] portion of the front of the building, across all of the phases, was ... to be demolished and modified," and on the ground level the asphalt pavement was to be extended from the end of the new concrete pad, to a point 50 feet west. Finally, plaintiff was responsible for installing elevator and dock equipment, as well as a new heating, ventilation, and air conditioning system, a new plumbing system, a new sprinkler system, and an entirely new electrical system.

Plaintiff commenced performance of Phase 1 in May 1996. For noise and safety reasons, the physical work of Phase 1 could not commence until plaintiff first erected a floor-to-ceiling noise-and-dust barrier the width of the building to separate the Phase 1a and 1b work from Phase 2, where the USPS was actively engaged in its operations. The barrier was placed in the QPDC according to the USPS's specifications on drawing A2, "First Floor Plan at Truck Dock Area": running along the entire 16.8 line and then wrapping around Phase 1 at the back of the QPDC, from the 16.8 line to column line 21, to protect areas used for post office security. Phase 2 was located to the north of the barrier (the left side of drawing A1), and Phase 1 to the south, with Phase 1a extending from the barrier to approximately the 18.5 column line, and Phase 1b comprising the remainder of the work.

Once the construction barrier was in place, plaintiff began the Phase 1a and 1b interior demolition work. As outlined by Michael Zenobio, portions of the pre-existing concrete were removed, and one of plaintiff's subcontractors began pile driving. At that time plaintiff discovered discrepancies between the project drawings and the actual conditions in the USPS facility, which delayed

progress. Stephan E. Butler, plaintiff's Project Superintendent from May 1996 through December 1996, testified regarding the early work delays.[6]

Piles & Foundation Corporation, plaintiff's subcontractor for piles layout and installation, advised that the pile cluster for pile cap No. 3, which was required in the elevator area, could not be driven because of the location of the phase partition. Not only did the barrier impede the pile driver's ability to place certain piles,[7] but a portion of pile cap No. 3 physically needed to be underneath column line 16.8, where the barrier had been constructed. Thomas E. Feeney, Mr. Butler's supervisor, submitted an August 16, 1996 Request for Information ("RFI") No. 003 to Louis Erichiello, the designer on the project who was employed by Fanning, Phillips & Molnar, which documents that the USPS duly was notified about the issue.[8] According to Mr. Butler's September 9, 1996 Daily Construction Report ("DCR"), all Phase 1 pile driving had been completed, with the exception of the work blocked by the temporary wall. The DCR noted that plaintiff was "awaiting c[hange] o[rder] (addendum) from owner" and that the subcontractor, Piles & Foundation, would return to the site on Monday, September 16. Eventually, although not a direct result of RFI No. 003, plaintiff was directed to move the partition north in order to install the piles and pile caps.[9] From September 10 through September 12, 1996, plaintiff sawcut the asphalt at Bay 24 (in Phase 2), removed the barrier from column line 16.8, and re-erected the wall at Bay 23.

The additional sawcut at Bay 24 was necessary to allow access for the remaining piles

---

**6.** In addition to discussing the construction delays due to the contract drawings, Mr. Butler also testified about subcontractor delays not within plaintiff's control. In particular, the subcontractor Piles & Foundation Corporation, experienced an accident at an unrelated job site that prevented its return to the QPDC site from July 29 to August 8, 1996.

**7.** Mr. Butler testified plausibly that "the pile driving company needed a certain amount of area for the actual leader and equipment to get

in to drive the pile and a certain amount of area for access to service the pile and the leader while the driving would happen."

**8.** Although Mr. Butler could not recall if he was aware of RFI No. 003 at the time Mr. Feeney sent it, he was well aware of the problem.

**9.** The new location of the partition is marked in green on drawing A2, with Mr. Butler's initials "SEB" written next to the line.

and pile caps for the elevator pit.[10] As a result of the additional sawcut, Mr. Butler noticed that the elevator pit walls would not be able to interface with the pre-existing slab according to Detail 5 of structural drawing 4(S–4). Mr. Butler then submitted RFI No. 5, dated September 12, 1996, to Mr. Erichiello, noting this new problem and seeking advice.[11] On September 23, 1996, Mr. Erichiello responded that the "referenced changed saw cut location was not authorized"[12] and that the area would then require a new 12–inch–wide grade beam to be installed "from the bottom of the slab to the top of the existing pile caps." The USPS also requested that plaintiff provide its own shop drawings to remedy the elevator foundation problems.

Mr. Butler sent RFI No. 23 to Mr. Erichiello on October 3, 1996, which revisited the issue raised in RFI No. 005, i.e., "[d]ue to the cut and subsequent demo[lition,] the splicing details on drawing S–4 are not valid and need to be redesigned." The RFI advised that "Abcon, not being a design engineering firm cannot issue such [grade beam] drawings;" rather, the new 12–inch grade beam design is "owned" by the design architect/engineer. The issue of how the elevator pit would connect with the floor slab was not resolved until much later.

After the partition was moved, plaintiff completed its pile driving and placed the pile caps in Phase 1b. As plaintiff was preparing to start the grade beam work, plaintiff, per Mr. Butler, informed the USPS of its plans for completion of Phase 1b, which were to "place the grade beam sections of Phase 1b, construct the grade beams of Phase 1b, then construct the floor, then do the rest of the tenant fit-up work" in order to allow the USPS to take possession of Phase 1b.[13] Mr. Erichiello advised plaintiff that its Phase 1b plans could not be implemented because he had designed the grade beams to be monolithic, and therefore both Phase 1a and 1b must be poured at the same time.[14] The monolithic pour proved to be a problem for O'Leary Construction, plaintiff's concrete subcontractor, which was unable to perform the concrete work for both sub-phases simultaneously due to staffing, technical, and financial inadequacies.[15] Mr. Butler testified that O'Leary "didn't have the money to support the manpower and the materials that [one] needed to do that all at the same time in the compressed time frame we had."

During regularly scheduled Construction Progress Meetings between representatives from plaintiff, the USPS, and the architect/engineer, various issues concerning Phase 1b were discussed. The USPS was firm in its demand for a monolithic pour of

10. Mr. Butler testified that the additional sawcutting at Bay 24 was due to an initial layout error in the elevator pit area that plaintiff made while trying to coordinate drawing A–1 with drawing S–1. However, he also testified that, although the additional cut was "not an issue of the partition relocation, [the cut] was right on and into the Phase 2 area on these drawings. So had the wall not been relocated it would to [sic] have had to have been relocated at least in this area to have done this."

11. The RFI stated:

Due to pile layout (drawing S–1) the sawcut as shown on drawing A–1 was changed to allow access to pile locations and caps (attachment A–1, S–1). Due to the change, the details including the slab connection are no longer valid (drawing S–4 detail 5). Please advise.

12. The parties dispute whether plaintiff's second concrete cut was necessary. To rebut defendant's claim to that effect, plaintiff presented the testimony of George J. Tamaro, who was certified as an expert in structural engineering, with a

sub-specialty in foundation engineering. Mr. Tamaro testified that it would be impossible to drive 9 or 10 piles if the original, smaller cut-line from drawing A–1 were followed. Mr. Tamaro also approved of plaintiff's choice of pile-driving hammer as appropriate for the physical constraints present, although it was not the one specified in the contract. The court found Mr. Tamaro to be a highly competent and credible witness, who established the facts to which he testified.

13. The grade beams rest horizontally on the pile caps, which rest horizontally on the piles, which protrude vertically from the ground.

14. Mr. Butler explained that "generally many details on structural plans involving concrete involve multiple setups where you don't pour in one shot ... a monolithic detail would require you to pour ... in one uninterrupted placement of concrete ...."

15. Plaintiff's schedule only showed plans to be working on Phase 1b at that time.

the grade beams. However, the initial demand that all the grade beams for the entire Phase 1 had to be poured monolithically at one time was eventually dropped. Plaintiff was allowed to pour each grade beam monolithically over the length of Phase 1, but one at a time, depending on what its subcontractor O'Leary could handle.

On October 19, 1996, while plaintiff was pouring concrete, a large storm hit the region, which continued through the night. Mr. Butler testified that the White Stone area of Queens had substantial flooding, and the site itself had been flooded by the waters of a nearby creek. The water submerged the forms and concrete that plaintiff had placed the previous day. Even after the water began to drain out of the building, the open water level was "lapping at the existing building." The DCRs from October 20 to October 24, 1996, chronicle the flood mitigation efforts, both interior and exterior, that were taken in order to get the project back on track.[16]

After the grade beams were completed, plaintiff next was required to form the structural slab for Phase 1a and 1b, which also involved concrete work. At this point plaintiff's relationship with O'Leary was "horrible," per Mr. Butler, as he attempted to get O'Leary to make progress on schedule, because O'Leary "didn't staff the job, he continued to drag his feet." Rather than terminate O'Leary, which for some reason Mr. Butler thought "would have been very detrimental to everybody," plaintiff supplemented O'Leary's crews with another subcontractor, JJC Construction. Both subcontractors poured the concrete slab for the floor area of Phase 1 up to the elevator pit area.

Nearing completion of the concrete work, plaintiff returned its focus to the elevator pit area.[17] Excavation machines could not gain access to the pit area due to the placement of the monolithic grade beams. Thus, work in the elevator pit area, such as digging for and removing the earth from the pile footings, was accomplished by hand, which required more time and labor than mechanized methods.

In November 1996 plaintiff discovered that the USPS drawings and the actual condition of the Phase 1 exterior asphalt work were incompatible. New pavement could not be placed without the gradient exceeding the 5% slope limitation in the USPS plans. Plaintiff notified the architect/engineer of this problem by telephone on November 15, 1996. Six days later, plaintiff submitted RFI No. 38 on the gradient problem. Plaintiff later submitted RFI No. 42 regarding a problem with the transition gradient from the old asphalt to the new asphalt.

The Phase 1b completion date, December 1, 1996, passed without delivery of the finished product. Mary Fengya, the Contracting Officer's Representative (the "COR"),[18] sent a letter dated December 17, 1996, informing plaintiff that it was in default because plaintiff did not "have phase 1 complete by December 1, 1996." The letter further advised that the USPS could terminate the contract if plaintiff were not to cure the default and that no future payments would be made until the USPS received "an acceptable realistic project schedule."

The understanding of Keith P. Zenobio, plaintiff's Vice President of Operations, was that only Phase 1b was to have been completed at the time of the letter. Moreover, regardless of the date, Keith Zenobio did not consider plaintiff to be in default because

---

**16.** Keith P. Zenobio, plaintiff's Vice President of Operations, testified that, with respect to interior work, plaintiff

> had to reset all the forms.... We had to recompact in the areas that were ready to be poured. We had to replace soils that were contaminated with saltwater that Lou Erichiello was concerned that if the rebar came in contact with the saltwater that there would be an issue with premature corrosion.

The exterior clean up "included removal and disposal of rebar that was also exposed to saltwa-

ter.... It included the placement of fill so that grades could be re-established after the soils were removed."

**17.** Mr. Butler testified that plaintiff had to "purposely neglect that area to work on the monolithic beams."

**18.** Although Ms. Fengya served as the Contracting Officer's Representative, she was an employee of the construction management firm Parsons Brinkerhoff Construction Services, Inc.

there were too many major issues to be resolved:

> [T]he grading in front of the apron on the outside of the building could not be installed in accordance with the contract documents. The facia panels on the face of the building where all the dock seals had to be installed was [sic] not available, it was discontinued a year prior to this contract being awarded. The floor in phase 1b where all the electrical panels were to be installed that fed all of 1b could not be installed because of a design issue at the elevator slab .... So, no matter which corner you turned, you were blocked on the inside of the building from designs, you were blocked on the outside, you could not turn over this phase without those three issues being resolved and they weren't resolved until later.

However, Keith Zenobio's response letter dated December 23, 1996, only mentioned a change in personnel and not the design issues.

The USPS began assessing liquidated damages in December by withholding money from plaintiff's November pay application. Although the contractual rate of liquidated damages was $750.00 per day, $56,250.00 was withheld initially, an amount that exceeded that stipulated in the contract for liquidated damages, even for the entire month of December. Keith Zenobio, via letter dated January 10, 1997, made clear plaintiff's position that liquidated damages could not be assessed until after the final completion date of September 23, 1997. He also requested information about how the USPS calculated the amount withheld. After receiving no response from the USPS, Keith Zenobio sent a follow-up letter on January 28, 1997. The only response from the USPS was a February 26, 1997 letter from Ms. Fengya explaining that it was the contracting officer's "position that we are well within our rights to withhold liquidated damages at this time."

In early January 1997, plaintiff secured a new concrete sub-contractor, Hirani Contracting Corporation, and sent Ms. Fengya a January 7, 1997 letter notifying her of this change. According to Keith Zenobio, Hirani performed the ongoing concrete work, including "the elevator pits and the stairs in Phases 1b and 1a, as well as working on the apron in front of Phases 1b and 1a on the exterior of the building." However, the concrete work outside the elevator pit and Phases 1b and 1a was still delayed pending new construction designs in January.

Ms. Fengya sent plaintiff a letter dated January 23, 1997, regarding the elevator pit area design, reaffirming the USPS's continuing position that the elevator pit wall problem was due to plaintiff's "over-cutting the slab to install steel piles," rather than a design problem. The letter concluded with the following solution: Plaintiff could "proceed with the corrective work as described in Fanning, Phillips [ & ] Molnar's drawing titled Structural Design Modifications, sheet 1 of 1 dated 1/14/97 provided it is at no additional cost to the United States Postal Service." Plaintiff did not agree to the USPS's solution, responding with an undated change order proposal in the amount of $82,289.00 for the "additional sawcutting, excavation and concrete work" in order to follow the architect/engineer's January 14, 1997 drawing.[19] Plaintiff also requested additional calendar days to be added to the phasing schedule and contract milestone completion date.

While plaintiff and the USPS tried to reach an agreeable solution to the elevator pit design, all other elevator work effectively was stopped. The elevator structure and equipment were to be mounted on the concrete slab in Phase 1a, and the elevator machine room to be completed in Phase 1b. Steven Gatto, plaintiff's new Project Manager after Mr. Butler, sent Ms. Fengya a letter via facsimile transmission on January 28, 1997, reminding the USPS that it had notice of the elevator pit area design issue from RFI Nos. 5 and 23. Mr. Gatto emphasized the chain reaction the design delays were having on other parts of performance.[20] An

---

**19.** Keith Zenobio testified that he believed the letter was sent in the third week of January—

after the drawing and before the February 14, 1997 meeting between plaintiff and the USPS.

**20.** Mr. Gatto wrote: "Due to the extreme delay

updated schedule was attached, but showing tentative work durations only.

Contracting Officer David Weglinski notified plaintiff by a letter dated February 5, 1997, sent via certified mail, that the USPS was "considering terminating" the contract. This letter indicated that the default was based on a failure "to submit an acceptable project schedule." The USPS scheduled a February 14, 1997 meeting, at which plaintiff could present its position on the issue of the Phase 1b default.

On February 6, 1997, before plaintiff received the certified letter from the USPS, Mr. Gatto sent Ms. Fengya a notice that as of February 5, 1997, the brick and block masonry contractor was "forced to demobilize." Mr. Gatto urged the USPS to make a decision regarding the brick to be used so that installation of the elevators, dock seals, and bumpers could proceed. Copies of the letter were sent to Mr. Weglinski and Keith Zenobio.

The items discussed at the February 14, 1997 meeting, "were a lot broader in nature than [Mr. Weglinski] anticipated," and he indicated that some of the performance problems were not entirely plaintiff's fault. He stated that the parties should work toward a joint solution. Plaintiff never received minutes for this meeting, although it is unclear whether such minutes were kept. At trial, Mr. Weglinski commented that "[s]ufficient information was brought to my attention to hold off that decision [for termination], pending the resolution of some of the issues that came up." During private discussions between Mr. Weglinski and Michael Zenobio the same day after the meeting, the contracting officer indicated that he wanted to find a mutually satisfactory resolution that would assure completion of the project.

Over several more months, plaintiff and the USPS continued to exchange letters— plaintiff requesting design information and funding for the construction of the new designs; the USPS requesting an updated project schedule and offering plaintiff a minimal amount of money to build the design changes. These letters were supplemented with undocumented detailed oral discussions. The Phase 1a deadline of April 1, 1997, passed without completion. Phase 2 was not commenced on April 1, 1997, as required by the contract. On April 23, 1997, the parties met to discuss unresolved issues. At this meeting plaintiff offered a new schedule that included completion of Phase 1 within four months of the meeting and of Phase 2 within three months thereafter, yielding proposed deadlines of August 23, 1997, and November 23, 1997, respectively. According to the minutes of the meeting, the contracting officer "concurred" with the proposed deadlines.

The parties dispute the scope of this concurrence. Plaintiff contends that the contracting officer's concurrence indicates a modification of the work schedule. Defendant counters that the concurrence was not a modification of the contract, but merely an effort to ascertain fixed dates by which the USPS would be able to use the freight elevators and the renovated loading dock. At no time prior to the December 31, 1997 termination for default did the USPS change any completion dates by contract modification. *See Abcon*, 44 Fed.Cl. at 631.

During May and June 1997, plaintiff received design solutions for the outstanding problems of the elevator pit slab and the exterior apron work, respectively. Plaintiff continued to perform while liquidated damages accrued and payment requisitions were reduced, thereby restricting plaintiff's ability to pay its subcontractors.

By August 5, 1997, plaintiff submitted Modification Requests 2 through 20 seeking additional compensation and time to complete the contract. Plaintiff based the Modification Requests on what it perceived to be design defects, differing site conditions, or USPS-directed changes. The parties met at least twice during August to discuss potential

---

in issuing this revised sketch, we had no choice but to de-mobilize our new concrete subcontractor. This delay has a negative impact on the block masonry and the steel erection for the elevator. In addition, the electrician is now unable to install the 'B', 'C' and 'D' power panels which supply the Levelators, dock seals and normal and emergency lighting systems for Phase 1B."

contract modifications and settlement of plaintiff's claims for money.

In late August 1997, the USPS authorized the release of a portion of the liquidated damages that it had retained. The authorization was made despite the fact that plaintiff continued to represent that it could not prepare an accurate construction schedule and that Phase 1 was incomplete. Plaintiff's proposed Phase 1 deadline of August 23, 1997, passed without completion.

In September 1997, a meeting was held among plaintiff; Heights Elevator Corporation, plaintiff's elevator subcontractor; and Charles J. Caramanna, the acting COR. The projected completion date for the freight elevator work was discussed, yielding conflicting recollections of the conclusion. Mr. Caramanna avers that plaintiff and Heights Elevator represented to him that the elevator work would be finished on or about February 14, 1998. *See* Affidavit of Charles J. Caramanna, Jan. 18, 1999, ¶ 6. Keith Zenobio testified that he had a firm commitment from Heights Elevator to complete the elevator work by May 15, 1998, and that both Heights Elevator and he told Mr. Caramanna as much. However, Keith Zenobio's testimony effectively was impeached by defense counsel, who introduced an October 20, 1997 letter from Keith Zenobio to Heights Elevator, as well as testimony from his deposition taken in December 2000, both of which mentioned a February completion date for the elevator work.

The contract deadline for Phase 2 passed on October 1, 1997, without delivery. On October 3, 1997, plaintiff received another refund of the liquidated damages that had been assessed by the USPS. Plaintiff submitted a formal request for an extension of the contract performance completion date on October 15, 1997. The contracting officer rejected the request by letter dated October 27, 1997. The USPS provided plaintiff an inspection report for Phase 1b detailing the work that must be performed for Phase 1b to be considered complete. Plaintiff's proposed Phase 2 completion date of November 23, 1997, passed without delivery.

The contracting officer issued final decisions on December 29 and 30, 1997, with regard to the 19 Modification Requests. On December 30, 1997, the contracting officer unilaterally modified the contract and withheld distribution of liquidated damages for the period from plaintiff's original December 1996 default through termination. By letter of December 31, 1997, the contracting officer terminated the contract. Plaintiff then brought this suit.

## DISCUSSION

### 1. *Judgment on partial findings*

At the close of trial, the court granted defendant's motion for judgment on partial findings, pursuant to RCFC 52(c), on one of defendant's two grounds, to wit, that defendant justified the default termination issued on December 31, 1997. Specifically, the court ruled that Contracting Officer Dane A. Weir, who replaced Mr. Weglinski, had a reasonable belief that there was no reasonable likelihood that the contractor, having failed to meet two benchmark dates for turning over Phases 1b and 1a, could perform the entire contract effort within the time remaining for contract performance.

RCFC 52(c), provides, as follows:

> If during a trial a party has been fully heard with respect to an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party on any claim, counterclaim, cross-claim or third-party claim that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

"In the Court of Federal Claims, the judge serves as both the trier of fact and the trier of law." *Cooper v. United States,* 37 Fed.Cl. 28, 35 (1996). A motion for judgment on partial findings requires more than determining if plaintiff has made a *prima facie* case. Rather, Rule 52(c) allows the judge to weigh the evidence presented and resolve credibility issues consistent with the evidence, rather than in favor of the plaintiff. *See Cooper,* 37 Fed.Cl. at 35 (citing *Howard Indus., Inc. v. United States,* 126 Ct.Cl. 283, 289–90, 115

F.Supp. 481, 484–85 (1953); *Cities Serv. Pipe Line Co. v. United States*, 4 Cl.Ct. 207, 208 (1983), *aff'd*, 742 F.2d 626 (Fed.Cir.1984)). The Court of Claims in *Howard Indus.* instructs that the time for a plaintiff to prove its case is during the plaintiff's case in chief. "A plaintiff has no automatic right to cross-examine a defendant's witnesses for the purpose of proving what the plaintiff [sic] failed to establish during the presentation of its case." *Cooper*, 37 Fed.Cl. at 35.

Plaintiff's evidence—indeed, plaintiff's best-case scenario—as testified to by its scheduling expert, Richard J. Sieracki, is that plaintiff is entitled to extensions totaling 195 days.[21] This period of time, added to the contract completion date of October 1, 1997, would extend plaintiff's completion of Phase 2 by four months beyond that date. The only evidence on point adduced by plaintiff before resting its case is an estimate that the Phase 2 work could have been completed in four months or less if the USPS had not required that Phase 2 commence after the completion of Phase 1a. However, it is clear that the USPS wanted the two phases separate in order to continue the QPDC operations, and plaintiff is not entitled to rewrite the contract. After defendant put on its case, and having evaluated all the evidence, the court affirms the grant in part of defendant's Rule 52(c) motion.

### 2. *Termination for default*

■■■ Termination for default is "a drastic sanction, which should be imposed (or sustained) only for good grounds and on solid evidence." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir.1987). The Government bears the initial burden of proof to show that the contractor was in default at the time of termination. *Lisbon*, 828 F.2d at 763–64. The default article of a contract does not require termination by the Government after a finding of default, but provides the procuring agency with the discretion to do so, so long as that discretion is reasonably exercised. *See Darwin Construction Co. v. United States*, 811 F.2d 593, 596 (Fed.Cir.1987) (citing *Schlesinger v. United States*, 182 Ct.Cl. 571, 390 F.2d 702, 709 (1968)).

■■■ The record is clear that plaintiff not only failed to meet the two milestone end-dates for Phases 1b and 1a, but also had not commenced work on Phase 2 by the date on which the contract required the entire project to be completed. Failure to meet two delivery deadlines has been held as proper grounds for termination for default. *See James E. Kennedy, trustee v. United States*, 164 Ct.Cl. 507, 512, 1964 WL 8588 (1964) ("[I]t cannot be said that failure [of defendant] to act in January [when the first delivery date was missed] precluded defendant from acting as it did when the [second] delivery date was not met.")

Plaintiff argues that the termination for default is wrongful on the ground that plaintiff is entitled to an extension of time for delay caused by the USPS. As previously

---

21. Plaintiff retained Tucker Alan, Inc., where Mr. Sieracki serves as a vice president, in June 1998 to "analyze project documentation, interview project personnel to determine if there was [sic] any delays that occurred on the project that might be excusable delays." Mr. Sieracki testified that he was familiar with the contractual definition of excusable delay, part 1.C.3 of the contract, which provides, in pertinent part:

Except with respect to defaults of subcontractors, the contractor will not be in default by reason of any failure in performing this contract in accordance with its terms (including any failure by the contractor to make progress in the prosecution of the work that endangers performance) if the failure arises out of causes beyond the control and without the fault or negligence of the contractor.

Mr. Sieracki also noted that the excusable delay "must be on the critical path of the project to the extent that the excusable delay results in extension of the completion date of the project." His review included an extensive collection of documents: the project drawings, the contract, the project specifications, the daily reports prepared by both plaintiff and the USPS, the RFIs and their responses, meeting minutes, schedules, and so forth. Mr. Sieracki started his critical path analysis with the June 4, 1996 schedule that was approved by the contracting officer. Earlier, Mr. Butler had testified, unconvincingly, that this same schedule was more of a rough draft.

Mr. Sieracki described the schedule as a critical path format even though the contract did not require a critical path schedule. However, the schedule did not show the necessary logic relationships. It is not necessary to discuss the various steps involved in Mr. Sieracki's analysis, as the end result, 195 excusable days, does not help plaintiff's case.

noted, even with the extensions of time amounting to 195 days, plaintiff still would have been in default of the contract as of the termination date. Furthermore, although the USPS allowed the follow-on surety contractor to work on all three phases concurrently, the USPS was not obligated to allow plaintiff to do so.

Having heard testimony and reviewed exhibits over nine trial days—most of which was devoted to plaintiff's case—the court finds much to criticize in plaintiff's discharge of its responsibilities under the contract, as well as its failure to adhere to customary prudential conduct in the construction industry of writing letters to confirm what plaintiff would have been expected to view as understandings important to plaintiff's successful completion of the contract. Moreover, plaintiff had problems with its subcontractors that were not attributable to any actions or inactions of the USPS.

The court is left with the firm conviction that, in the main, plaintiff did not retain quality subcontractors. Mr. Butler, plaintiff's former Superintendent, who was on the contract as of May 1, 1996, when the notice to proceed issued, manifested a dismissive attitude about the project schedule testifying that such schedules are submitted without consulting with subcontractors. Michael Zenobio disavowed responsibility for Pelle Doors, the manufacturer of the elevator doors that plaintiff's subcontractor, Heights Elevator, had been retained to install. As plaintiff's subcontractor, delay on Pelle's part is attributable to plaintiff. The record also supports a finding that plaintiff was dissatisfied with the performance of O'Leary irrespective of delays for which the USPS is responsible. Even though the USPS was responsible for actions and inactions that put plaintiff on a trajectory of delay and that, for a period of time, were also responsible for plaintiff's inability to pay its subcontractors, the USPS was justified fully in lacking confidence in plaintiff's ability to complete this contract.[22]

*3. Excuse for default*

Once it is held that a contractor has defaulted, it must next be determined if the default is excusable. *Kennedy,* 164 Ct.Cl. at 512. If a contractor can show that improper government actions were the primary or controlling cause of the default and rendered the contractor financially incapable of performing, then the default will be excused. *See TGC Contracting Corp. v. United States,* 736 F.2d 1512 (Fed.Cir.1984); *see also National Eastern Corp. v. United States,* 201 Ct.Cl. 776, 477 F.2d 1347, 1356 (1973). Plaintiff's case focused on the events that launched plaintiff on its ruinous course. Defendant's case did not establish its version of these events, because defendant had succeeded on its Rule 52(c) motion, which removed from the proofs defendant's evidence countering plaintiff's justification of a time extension to extend the contract completion date. The court held that plaintiff's default was not the result of excusable delay. Thus, defendant's case on defense addressed whether plaintiff's default should be excused, rather than plaintiff's conduct leading to the default.

Ultimately, the record that plaintiff laboriously developed at trial supports a finding that the USPS's improper assessment of liquidated damages ("LDs") had a significant adverse impact on plaintiff during a critical period of performance and constituted a breach of defendant's implied duty to cooperate. *See Darwin Constr.; see also Seven Sciences, Inc.,* ASBCA No. 21,079, 77–2 BCA ¶ 12,730 (finding that "the deterioration of [plaintiff's] finances and its eventual shutdown were caused primarily by the Government's protracted delay and ultimate refusal to provide [plaintiff] with responses to its inquiries which we have found to be meritorious.").

Plaintiff pleaded that the USPS's conduct in administering the contract amounted to a material breach, such that plaintiff's failure to meet the contract deadlines should be excused and the termination for default converted to one for convenience of the Government. In particular, plaintiff charged that the USPS (1) wrongfully assessed LDs be-

---

22. Plaintiff, in a scramble to recoup its losses and gain momentum, submitted, at one time, 19

modification requests with no supporting documentation whatsoever.

ginning in December 1996, ultimately totaling $297,000.00;[23] and (2) failed in its duty to cooperate by not negotiating or paying requests for equitable adjustments totaling over $200,000.00. Plaintiff sought to prove that these actions breached the USPS's duty to maintain sufficient project funding. Defendant insists that such a showing must consist of bad faith on the part of contracting personnel.

■ The court acknowledges that government agents are presumed to discharge their duties in good faith. *See, e.g., Spezzaferro v. FAA,* 807 F.2d 169, 173 (Fed.Cir.1986); *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298 (1976). To rebut such a presumption, in certain instances, *e.g.,* alleging that the Government terminated a contract in bad faith, a showing of "irrefragable proof" of acts of bad faith is required. *Kalvar Corp.,* 211 Ct.Cl. at 198, 543 F.2d at 1301–02; *see Libertatia Assocs., Inc. v. United States,* 46 Fed.Cl. 702, 706–07 (2000) (arguing phrase "irrefragable proof" is misleading because it can never be satisfied, and that "evidence of some specific intent to injure" or "acerbated by animosity towards plaintiff" is more accurate). However, the implied duties of good faith, fair dealing, and cooperation can be breached by failure of a government agency to negotiate and make payment, and a showing of bad faith is not required. Instead, plaintiff can satisfy its burden by proving a lack of diligence or failure to cooperate in the other party's performance. *See Malone v. United States,* 849 F.2d 1441, 1445 (Fed.Cir.1988).

■ Against this backdrop the following facts related to the USPS's conduct have been established by a preponderance of the evidence:

First, Amendment 1 to the contract contains a phasing plan that lists three dates for substantial completion and turn-over. Ms. Fengya established the importance of the

sequencing of the phased construction to the USPS QPDC. The contract recites that Phase 1b was to be completed as of December 1, 1996; Phase 1a by April 1, 1997; and Phase 2 by October 1, 1997. The contract was phased in order to allow the owner to carry out its operations during the construction of an expanded loading dock and installation of three new elevators.

Second, plaintiff failed to meet the December 1, 1996 deadline for completion of Phase 1b. For reasons that will be discussed, the USPS bears some responsibility for this delay. However, putting causation aside for this discussion, the contracting officer authorized the assessment of liquidated damages. Mr. Weglinski was the cognizant contracting officer, and he had assumed his duties on the project during the summer of 1996 after the project had been transferred from the Philadelphia office. He testified that when the date for completing Phase 1b passed, he assessed LDs "for that portion of the job."

While the USPS had the authority to assess liquidated damages pursuant to the procurement contract,[24] the USPS's contracts must conform to the requirements of the USPS Procurement Manual (the "Procurement Manual"). The Procurement Manual § 11.5.1.i "Liquidated Damages", ¶ 2, provides:

> When different completion periods for separate parts or stages of the work are specified in the contract, the clause may be revised to provide for liquidated damages for each separate part or stage in which delay will damage the Postal Service.

The Procurement Manual does not authorize assessment of LDs for the stages of work denominated as phases unless the contract includes a special provision therefor. *Cf. Troise v. United States,* 21 Cl.Ct. 48 (1990) (enforcing contract, not governed by Procurement Manual, that imposed LDs for each family housing unit for each day late,

---

**23.** The record does not contain a showing of how plaintiff arrived at this figure. Plaintiff's summary reflects LDs of $189,750.00.

**24.** The procurement contract's liquidated damages clause, Part 1.C.4.a states:

> If the contractor fails to complete the work, deliver the supplies, or perform the services with in the time specified in this contract, or any extension, the contractor must, in place of actual damages, pay to the Postal Service $750.00 for liquidated damages as agreed for each calendar day of delay.

even though contract did not break LDs into phases). Although the solicitation was amended on February 23, 1996, to include the effective phasing schedule, the LD clause in the QPDC contract was not so revised.

Third, almost $190,000.00 of LDs were assessed and withheld.[25] In his letter dated January 10, 1997 to Ms. Fengya, Keith Zenobio protested the initial amount of LDs assessed in the amount of $56,250.00. Plaintiff also alerted the contracting officer and Ms. Fengya of the impact on its ability to pay its subcontractors and thereby ensure their performance. In fact, plaintiff alerted the USPS contracting personnel throughout the period from February 1997 to October 1997 of plaintiff's deteriorating financial position.

Fourth, plaintiff was unable to pay its subcontractors during this period.[26] In addition to numerous letters to plaintiff from subcontractors requesting payment, PX 18 and 22, admitted as summaries under Fed.R.Evid. 1006, show that upon receiving the October 3, 1997 liquidated damages infusion of $189,750.00, plaintiff paid at least $175,825.00 to its subcontractors.[27] Moreover, the money that plaintiff received in October could not, and did not, repair the damage that was inflicted on plaintiff's relationships with its subcontractors that put plaintiff in a position further behind schedule when plaintiff already was trying to play "catch-up." Thus, not only was the imposition of LDs unauthorized, it directly impaired plaintiff's ability to work toward the Phase 2 deadline for final contract completion.

The court is not required to find that but for the wrongful assessment of LDs, plaintiff would have met the October 1, 1997 deadline for Phase 2. The assessment of LDs substan-tially impeded plaintiff's ability to perform during a critical catch-up period, and that fact is sufficient to establish a breach of the duty to cooperate. "[T]here is in every government contract, as in all contracts, an implied obligation on the part of the Government not to willfully or negligently interfere with the contractor in the performance of his contract." *Peter Kiewit Sons' Co. v. United States,* 138 Ct.Cl. 668, 674, 151 F.Supp. 726, 731 (1957). " 'Subterfuges and evasions violate the obligation of good faith,' as does lack of diligence and interference with or failure to cooperate in the other party's performance." *Malone,* 849 F.2d at 1445 (Fed.Cir. 1988) (quoting *Restatement (Second) of Contracts* § 205 comment d).

Although the court has found and concluded that the USPS's termination for default was justified, it does not follow that the delays attributable to the USPS did not impact plaintiff. Indeed, the unauthorized assessment of LDs compounded plaintiff's problems. Discussing government contract administration where more than one person acts on behalf of the Government, the Court of Claims noted:

> It is difficult to apply terms with moral implications, such as "good faith" to impersonal legal entities such as corporations or governments, especially in situations where they act on one matter through a number of agents. . . . But the test of good faith should be the same for an entity that must act through agents as for an individual acting for himself. . . . If the aggregate of the actions of all the agents would, if all done by one individual, fall below the standard of good faith, the entity for whom the

---

**25.** In the December 31, 1997 termination letter, Mr. Weir stated that the USPS had released $210,849.00 in LDs to assist plaintiff with cash flow problems. The record is unclear as to the source of this figure.

**26.** Plaintiff's inability to pay its subcontractors was also due, in large part, to the USPS's reducing plaintiff's payment requisitions. Keith Zenobio went through Application for Payment No. 6, line by line, discussing the reasons why he thought payments should not have been withheld for certain line items. He repeatedly gave either one of two reasons: The items should have been listed as "materials stored," rather than as "work completed;" or the work had been mostly completed, but needed minor corrections. Keith Zenobio's testimony on the latter reflected very poorly on plaintiff, as he was indignant that the USPS did not pay 100% of the listed price for an elevator wall that "bowed a little" and a door that was "out of plum," and only paid 50% for the roofing when a pond was created in the facility while the roof was being installed.

**27.** Plaintiff's payments to subcontractors in September and November 1997 were approximately $30,000.00 and $5,000.00, respectively.

various agents acted should be held to have violated that standard.

*Struck Constr. Co. v. United States,* 96 Ct.Cl. 186, 221, 1942 WL 4411 (1942). The USPS's conduct in the circumstances of this contract "falls below the standard of good faith" due to actions other than the unauthorized withholding of LDs.

That plaintiff was in a catch-up position during the period that LDs were withheld was in no small part attributable to a mindless directive from the USPS's on-site engineer and one major failure to act on the part of the USPS's architect/engineer on the project. The court heard testimony from representatives of all the various entities involved in contract administration other than a representative of the architect/engineer, Mr. Erichiello. Mr. Erichiello, serving as field engineer, was the only representative of the architect/engineer on-site. He precipitated delays by (1) requiring one uninterrupted placement of concrete for the grade beams; and (2) not responding to plaintiff's repeated requests for information for a redesign of the so-called elevator pit slab for an extensive period of time.

Moreover, the contracting officer's failure to do more than exhort the architect/engineer to respond to plaintiff's RFIs precipitated a long delay from December 27, 1996, through May 1997, during which period he repeatedly and steadfastly refused to grant any extensions of time for plaintiff's performance. Rather than offer alternative designs, the USPS chose to defend the designs of its architect/engineer. In particular, the USPS's continued insistence that plaintiff's over-cut in the elevator pit area created the need for new drawings ignored the fact that plaintiff's over-cut was due to a flaw in the demolition drawings;[28] the same applies to the exterior apron work delays. These delays are illustrative of actions for which the USPS is responsible and which also contributed to plaintiff's financial vulnerability. "[W]here delinquencies occur which are not excusable, then termination for default is within the Government's rights.... [T]he

rule would be otherwise if the delays resulted from circumstances with respect to which the Government bore the risk." *Franklin E. Penny Co. v. United States,* 207 Ct.Cl. 842, 855, 524 F.2d 668, 675–76 (1975). The USPS bears responsibility for its own contractors and for the drawings of its architect/engineer. *See J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 709, 412 F.2d 1360, 1373–1374 (1969) (" 'It is well settled that where the government orders a structure to be built, and in so doing prepares the project's specifications prescribing the character, dimension, and location of the construction work, the government implicitly warrants, nothing else appearing, that if the specifications are complied with, satisfactory performance will result." ') (quoting *J.D. Hedin Constr. Co., Inc. v. United States,* 171 Ct.Cl. 70, 76, 347 F.2d 235, 241(1965)).

It is widely accepted that "bad facts make bad law," and the court suspects that is the case at hand. Taking into account both the Rule 52(c) ruling that the termination for default was justified and the holding that certain elements of the USPS's contract administration breached the duty of good faith such that plaintiff's default is excused, the record shows that neither party lived up to its responsibilities under the contract. Based on the facts presented at the trial on liability, it would be an injustice if plaintiff were to recover damages based on Phase 2 of the contract, notwithstanding the USPS's errors in judgment. However, to sever Phase 2 from the contract would be unprecedented.

In the hope that the parties will find their way to a mutually acceptable settlement without a damages trial, the court reminds them that final judgment is not entered until the issue of damages is resolved and that, pursuant to Rule 54(b), the court can revisit its ruling on liability if warranted by the evidence introduced in any damages phase.

## CONCLUSION

Based on the foregoing, the termination for default is converted to termination for convenience due to the USPS's breach of the

---

**28.** It must be noted, however, that even plaintiff's expert in structural engineering, Mr. Tamaro, opined that the second concrete slab cut made by plaintiff was larger than necessary in certain places.

duty of good faith and cooperation. The termination for default itself was not excusable. Accordingly,

**IT IS ORDERED,** as follows:

1. Plaintiff is entitled to judgment on Counts VIII and XI of the complaint, and defendant is entitled to judgment on the remaining counts of the complaint.

2. The parties shall file a Joint Status Report by July 30, 2001, proposing a schedule for discovery, pretrial, and trial to resolve damages. Trial, not to exceed 5 days, shall commence at 10:00 a.m., Monday, October 29, 2001.

### *ORDER*

On July 12, 2001, the parties filed a Joint Motion for a Reconsideration of the Court's June 29, 2001 Order. The court grants the parties' motion. Accordingly,

**IT IS ORDERED**, as follows:

1. Paragraph 2 of the order and opinion entered on June 29, 2001, is vacated.

2. The Clerk of the Court shall enter judgment for plaintiff and defendant pursuant to ¶ 1 of the opinion and order entered on June 29, 2001. The judgment for plaintiff shall state that plaintiff is awarded a termination of the contract for the convenience of the Government, with the amount of any payment due plaintiff to be determined as provided by section 6.9.a.2. of the contract.

3. The judgment will recite that each party shall bear its own costs.